**STATE of Minnesota, Respondent,**

v.

**A.C. FORD, Jr., Appellant.**

No. C5–93–1872.

Supreme Court of Minnesota.

Sept. 1, 1995.

Rehearing Denied Nov. 15, 1995.

tions. The sentence for attempted murder and the sentence for murder were to run consecutively. The trial court further indicated that the Department of Corrections had the discretion to modify Ford's sentences from consecutive to concurrent provided that Ford showed some ability to be rehabilitated or cooperate with the programs available at Oak Park Heights, including paying restitution to Officer Haaf's family.

On appeal, Ford contends that: (1) by impanelling an anonymous jury, the trial court violated Minn.R.Crim.P. 26.02, Jury Management R. 814, and denied him his constitutional right to a fair trial; (2) the court erroneously admitted statements he made to the police; (3) the evidence presented at trial was insufficient to support the convictions; (4) the court erroneously admitted the testimony of Wyvonia Williams; (5) the trial court erroneously refused to allow Ford's attorney to cross-examine Percy Melton regarding a withdrawn plea agreement; (6) the prosecutor committed reversible misconduct in closing arguments; (7) the trial court erroneously sustained a *Batson* challenge made by the state; and (8) the sentence imposed was contrary to law.

We affirm in part, reverse in part and remand.

Melissa V. Sheridan, Assistant State Public Defender, St. Paul, for appellant.

Mark V. Griffin, Assistant County Attorney, Minneapolis, Hubert H. Humphrey, III, Attorney General, St. Paul, for respondent.

## OPINION

TOMLJANOVICH, Justice.

On September 25, 1992, Minneapolis police officer Jerome Haaf, while in uniform, was shot to death at the Pizza Shack Restaurant in south Minneapolis. Gerald Lubarski, who was sitting with Officer Haaf, was wounded. On May 28, 1993, an anonymous Hennepin County jury convicted appellant, A.C. Ford, Jr., of first-degree premeditated murder under Minn.Stat. § 609.185(1) (1992), first degree-murder of a peace officer under Minn. Stat. § 609.185(4) (1992), and attempted first-degree murder under Minn.Stat. § 609.17 (1992). The trial court sentenced Ford to 240 months for the attempted murder conviction. For sentencing purposes, the trial court merged Ford's first-degree premeditated murder conviction and his first-degree murder of a peace officer pursuant to Minn. Stat. § 609.035 (1992), and sentenced Ford to life imprisonment for these murder convic-

At trial, evidence was presented that on September 24, 1992, Mwati "Pepi" McKenzie; Shannon Bowles; Samuel "Sharif" Willis; Monterey Willis, Sharif's nephew; Richard, a minor; Ed Harris; and Ford attended a meeting at North High School relating to the recent beating of an elderly blind black man by the Metropolitan Transit Commission (MTC) police. Testimony was given that each of these individuals was a member of the Conservative Vice Lords (Vice Lords) street gang. Testimony was given that Sharif Willis was the head of the Vice Lords, A.C. Ford was second in command, and Richard, McKenzie, and Bowles were foot soldiers, the lowest ranking Vice Lords. Testimony was also given that the chain of command in the Vice Lords is very important and that a foot soldier could not unilaterally decide to kill a police officer without an order from a higher ranking Vice Lord.

Dawn Jones, Monterey's girlfriend, testified that on September 24, 1992, she was at Sharif's house and remained there when others went to "some north side meeting." She testified that after the meeting McKenzie, Bowles, Ford, Monterey, and Sharif returned to Sharif's house and were upset about the incident. While sitting in the living room, she heard Monterey in the kitchen say "my girl is down." At that time, McKenzie, Sharif, Monterey, Bowles and Ford were in the kitchen. One minute later, Monterey called her into the kitchen and asked her if she would shoot a bus driver to which she responded yes. He then asked her if she would shoot a 5–O, a cop. She said no. She testified that next she, Monterey, and Bowles dropped Sharif off at an apartment building and then got some food. On the way back to Sharif's house, Monterey again asked her if she would shoot a bus driver and placed a gun in her hands. She again indicated she would. When she and Monterey got back to Sharif's house, Jones testified that she stayed in the car to finish her food.

Richard,[1] a minor, testified that on the evening of September 24, 1992, Ford, Harris, Sharif, Monterey, McKenzie and he went to North High School for a community meeting regarding the recent beating of a black man by MTC police. After the meeting, Richard and McKenzie returned to Harris' house where they "rented" a car from a drug addict in exchange for some crack cocaine. Later that night, Richard and McKenzie drove to Sharif's house. Richard testified that he and McKenzie arrived at Sharif's house between 11 p.m. and midnight. Ford was already there, and about five minutes later, Bowles, Monterey, and Dawn Jones arrived together. Sharif was not present.

Richard testified that Ford said, "You all ready to do this? This is what we are going to do. We are going to walk up on the number five bus line and shoot the bus driver." Monterey replied, "No man, you must be crazy," to which Ford responded, "All right, then let's do the Pizza Shack." Monterey then pointed to Dawn Jones and said "I

know her, she ain't going to snitch." Ford then went to the front porch and got a paper bag out of the freezer and gave it to McKenzie. Richard saw the outline of a revolver in the bag. McKenzie left the room and when he came back, he had a gun in his pants above his belt line.

In a statement to police, Ford said he had been at Sharif's house during the evening of September 24, 1992. He stated that sometime during the evening, Monterey said his girlfriend Dawn Jones was going to shoot a bus driver. Ford said he talked the others out of the plan, and Monterey then said "they was gonna go up on Lake Street and make some noise up by the Pizza Shack." Ford thought Monterey meant to shoot out some windows at the Pizza Shack. He stated: "Bowles was only supposed to go over to the Pizza Shack with McKenzie and shoot holes in the windows of the Pizza Shack." Ford said Monterey got a gun from the freezer on the porch, gave it to McKenzie and told him that he and Bowles were to go to the Pizza Shack "to make some noise." Ford said that when Monterey handed McKenzie the gun, Richard, Bowles, and Dawn Jones were also present. Ford thought Bowles also had a gun because he patted his front and said, "I got mine."

Dawn Jones testified that about 15 to 20 minutes after Monterey had gone into Sharif's house, people came out of the house and got into cars. Monterey came to the car she was in and opened the door, grabbed the gun, and said "there has been a change." She then got out of the car and walked into the house with Monterey. He then told McKenzie to "come on" and told her to lock the door. As McKenzie left, she heard him say, "I'm going to Chicago when all this shit is done."

Richard testified he and McKenzie got in the "rented" car, and Ford, Bowles, and Monterey got into a truck driven by Ford. McKenzie said they were going to the Pizza Shack to kill a cop. No one, including McKenzie, ever said anything about breaking windows. Richard testified that both vehi-

---

1. At trial, Richard testified that in exchange for his testimony, the state had agreed to move his family out of Minnesota and agreed not to attempt to certify him as an adult for his role in the shootings.

cles stopped at the corner of 17th Avenue South and 31st Street and McKenzie and Bowles got out and began walking towards the Pizza Shack Restaurant. Richard testified that at that time McKenzie was wearing black Reebok tennis shoes and a cap with a gold "P" on it. Bowles was wearing white Reebok tennis shoes. Ford stated that Richard and McKenzie drove in one car and Ford drove in another car with Monterey and Bowles. Ford stated that at about 12:30 a.m., he dropped Bowles off in the area of 17th and Lake Street, and he saw Bowles meet up with McKenzie, whom Richard had dropped off.

Witnesses present at the Pizza Shack restaurant on Friday, September 25, 1992, testified that between 1:30 and 2:00 a.m, two or three black males entered the restaurant, walked directly to Officer Haaf, the only uniformed officer in the restaurant, drew revolvers from their belts, and fired at Officer Haaf's back. Two bullets entered Haaf's back. He died a short time later. Gerald Lubarski who was sitting with Officer Haaf also was wounded. Witnesses testified that one shooter was wearing a dark cap with the letter "b" on it and black tennis shoes, and the other shooter was wearing white tennis shoes.

Richard testified that Ford told him to circle the block and pick up McKenzie and Bowles if they ran his way. Richard circled the block a few times, then he thought he saw Ford turn at 31st and Cedar Avenue South. Thinking Ford had picked McKenzie and Bowles up, Richard testified that he went to Ed Harris' house. Ed Harris' wife, Loverine, testified that early in the morning of September 25, McKenzie and Bowles came into her house. They acted scared and said they had shot a crippled man and needed to change clothes and shoes. She testified that McKenzie was wearing black Reebok tennis shoes and a dark cap with a "P" on it, and Bowles was wearing white Reebok tennis shoes. She stated that her husband, Ed Harris, took their shirts, wrapped their guns in them, hid them in the attic, and gave them

new shirts and shoes. Loverine further testified that they asked Ed for something to wash the gun powder off their hands, and went into the bathroom for a few minutes.

Richard testified that when he arrived at the Harris home, McKenzie and Bowles were already present. Both had changed clothes and seemed jumpy. McKenzie, Bowles, and Harris all went into the bathroom together. McKenzie told Richard, "I think I shot a cop."

Loverine testified that Richard arrived shortly after McKenzie and Bowles arrived. She stated that Richard said "he dropped these people off at the Pizza Shack to shoot a police," and that Richard was surprised to see them there because the plan had been for him to pick them up in the "rental" car. Loverine testified that the next day Vice Lord Larry Flournoy brought the guns and clothing from the Harris house to where he was staying. In a search of the apartment where Flournoy was staying, the police recovered a pair of black shoes, a pair of white shoes, and a dark cap with a "P" on it. All of these items were introduced at trial.

After Officer Haaf's murder, McKenzie went to Chicago to stay with Naomi Willis, Sharif's sister. While staying with Naomi Willis, McKenzie met Wyvonia Williams. Williams testified that McKenzie told her that the officer had been shot because they were upset about a blind man being harassed on a bus. She testified that McKenzie said "Sharif put the hit out on the officer and that A.C. Ford was in charge of it." She further testified that McKenzie told her that he rode in a car with Ford and Monterey to the Pizza Shack.

Percy Melton [2] shared a cell with Bowles. He testified that Bowles told him that he, McKenzie, and Richard went to the Pizza Shack, shot a cop, then ran to where the car was supposed to be, and when it wasn't there, they ran to Ed's house. Bowles also gave a letter to Melton to deliver to Ford. The letter said:

2. At trial, Melton testified that in exchange for his testimony, the state had agreed to enter into a plea agreement reducing his possible 98-month prison sentence to 12 months in the workhouse and 10 years probation.

1. I have no aliases. My name is Shannon.

2. I'm not V. Lord. This breaks our link of me and you, also that statement of you giving me orders about whatever. Ok.

3. We've never driven together at any time. They took Steve's truck saying it was involved but you have your on (sic) car and I wouldn't let anyone drive someone else (sic) vehicle.

\* \* \* \*

9. I was nowhere around you that night. Richie is saying these things to clear himself in the Harris killing. He doesn't know me.

On October 9, 1992, two weeks after Officer Haaf was slain, Ed Harris was shot to death in an alley behind his house. Police believed that Ed Harris was killed by other Vice Lord members who were afraid Harris was providing the police with information relating to the Haaf murder.

## ANONYMOUS JURY

On March 18, 1993, three weeks prior to voir dire commencing, the trial court issued an order stating: "In the interest of justice and for the safety and protection of potential jurors, the names of qualified prospective jurors shall be kept confidential pursuant to Rule 814 of the Jury Management Rules." Ford contends that impaneling an anonymous jury (1) denied him his constitutional right to a fair trial and (2) violated Minn. R.Crim.P. 26.02 and Jury Management R. 814.

■ We utilize an abuse of discretion standard when reviewing a trial court's decision to impanel an anonymous jury. *State v. Bowles*, 530 N.W.2d 521, 531 (Minn.1995). A trial court should not impanel an anonymous jury without first concluding there is strong reason to believe the jury needs protection from external threats to its members' safety or impartiality; and second, takes reasonable precautions to minimize any prejudicial effect the jurors' anonymity might have on the defendant. *Id.* at 530–31.

Ford contends the first prong of the test is satisfied only if the state demonstrates the defendant was personally involved in an obstruction of justice incident. Case law from other jurisdictions employing the test we have adopted does not support this contention. For example:

In *Paccione* the rule was satisfied where the defendant faced serious penalties if convicted, there was evidence that a codefendant had been murdered by certain defendants in the case, the defendant was a member of the Gambino crime family, government witnesses had received anonymous threats, and there was extensive pretrial publicity. 949 F.2d [1183] at 1192–93 [(2d Cir.1991)]. In [*U.S. v.*] *Crockett* [979 F.2d 1204 (7th Cir.1992)] the rule was satisfied where one defendant headed and the other was a member of a violent criminal organization, there was evidence the defendants had attempted to influence or intimidate witnesses, and there was extensive pre-trial publicity. 979 F.2d at 1216. *See also United States v. Vario*, 943 F.2d 236, 240 (2d Cir.1991) (where the defendant was already charged with obstruction of justice, and there was extensive pre-trial publicity), *cert. denied*, 502 U.S. 1036, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992); *United States v. Thomas*, 757 F.2d 1359, 1362, 1364 (2d Cir.) (where the defendants were members of an organized criminal group and were charged with murdering government witnesses), *cert. denied*, 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985), and *United States v. Scarfo*, 850 F.2d 1015, 1023 (3d Cir.) (where the jury would hear testimony that, if believed, could cause them to become apprehensive for their safety or the safety of their families), *cert. denied*, 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988).

*Bowles*, 530 N.W.2d at 530. We note that these circumstances are not an exclusive list of the situations in which an anonymous jury is warranted, but instead merely serve as examples of circumstances where other courts have found an anonymous jury appropriate.

■ In *Bowles* we found strong reasons existed to believe the jury needed protection

from external threats to its members' safety or impartiality. 530 N.W.2d at 531. The reasons mandating an anonymous jury in *Bowles* included:

> First, the state believed and ultimately presented credible testimony that Ed Harris had been murdered by members of the Vice Lords because they thought he may have been a government informant. *See Paccione,* 949 F.2d at 1192 (affirming use of anonymous jury due, in part, to the prosecution's belief that a codefendant's murder was connected to the case and to certain of the defendants). Second, once exposed to evidence that the Haaf murder was retaliatory in nature, jurors could have reasonably concluded that were they to convict Bowles, they or their families would be vulnerable to harassment or retaliation from members of the Vice Lords. *See Scarfo,* 850 F.2d at 1023 (affirming use of anonymous jury due, in part, to presence of evidence that could cause jurors to fear for their safety and the safety of their families). Third, as Bowles himself notes, the publicity surrounding the murder and the trial put pressure on the jury to convict. The jurors could have reasonably concluded that were they to acquit Bowles, they or their families would be vulnerable to harassment from the public. The jurors' anonymity may have actually protected them from this pressure, helping to preserve their impartiality. *See Vario,* 943 F.2d at 240 (affirming use of anonymous jury, in part, because of extensive pre-trial publicity).

530 N.W.2d at 531 (footnote omitted). In the present case, these same conditions existed. Thus, we conclude sufficient reasons existed to justify an anonymous jury.

To satisfy the second prong of the test, courts have relied upon three types of precautions to minimize the prejudicial effects of the anonymous jury: (1) extensive voir dire of the jurors to expose bias; (2) instructions from the trial court designed to eliminate any implication as to the defendant's guilt; and (3) explanations from the trial court that the purpose of anonymity was to shield the jurors from media harassment and undesirable publicity. *United States v. Eufrasio,* 935 F.2d 553, 574 (3d Cir.1991); *Scarfo,* 850 F.2d at 1025; *Thomas,* 757 F.2d at 1363. In *Bowles* we concluded that, of these precautionary measures, at a minimum the precautions a trial court must employ include "extensive voir dire to expose juror bias and instructions designed to eliminate any implication as to the defendant's guilt." 530 N.W.2d at 531.

On April 6, 1993, the trial court met with the jury pool for preliminary discussions, and made the following comments in relation to anonymity:

> First of all, each of you have been assigned a code number. You are not to give the code number to any other person. There will be three people that are going to contact you concerning this case. If you are contacted by anyone else, please don't respond to their questions. Don't even identify yourself as part of this jury pool. They are my law clerks. * * *

In addition, the following exchange took place:

> THE COURT: Yes, did you have a question?
>
> A POTENTIAL JUROR: Yeah, say like, like they said in orientation, you know, like they had that film in orientation we had last Thursday, what happens if like any member of the press, you say no comment to them or something?
>
> THE COURT: If you follow my instructions the press will not know who you are. You will note that I don't have your name. No other person is going to have your name.
>
> A POTENTIAL JUROR: Oh, okay.
>
> THE COURT: When we contact you to let you know when you should report back to Court, it will be only one of three individuals that call you. Myself, * * * [law clerks]. We will not be giving your code number or your name to any other person. You should help us by following that rule yourself. And we are confident that you will not be bothered by the press or any other person if you follow that rule.

The court then distributed a 23–page questionnaire containing 95 questions.

During individual examination of the eventual jury members, the issue of anonymity only arose upon defense counsel's questioning with four of the ultimate twelve jurors. Of the four jurors questioned about their feelings about anonymity, none indicated they felt it caused them to be more fearful of Ford.[3]

After three jurors had been chosen, a conference with counsel occurred. At that conference, the court modified its previous order and indicated it would release jurors' names upon application by counsel indicating why the name would be helpful or necessary. Subsequently, the prosecution sought the name of one of the jurors. The trial court released the juror's name to both parties. During voir dire the court allowed the parties to question each potential juror for 45 minutes and allowed additional questioning if cause existed. The entire voir dire process took 22 days. Neither counsel requested a jury instruction as to how the jurors should consider their anonymity, and the court gave no instructions regarding anonymity either before or after the trial.

In *Bowles* we said a trial court must at a minimum include instructions explaining the reasons for the juror's anonymity that eliminate any implication as to the defendant's guilt. Unlike *Bowles*, where the trial court properly gave an explanatory instruction to the jury panel prior to trial, in this case, the trial court never gave an explanatory instruction. The precautions we articulated in *Bowles*, extensive voir dire and an explanatory instruction, were designed to avoid actual prejudice. If these precautions are employed, a presumption exists that actual prejudice has not occurred. At the time Ford was tried however, the trial court did not have the benefit of our decision in *Bowles*; therefore, we review for actual prejudice, and for the following reasons conclude that no prejudice occurred.

First, Ford was permitted to engage in an extensive voir dire of the eventual jurors regarding their ability to be impartial, their belief in the presumption of innocence, and the effect of their anonymity. *See Eufrasio*, 935 F.2d at 574. Thus, the trial court properly utilized one of the precautionary measures we mandated in *Bowles*, 530 N.W.2d at 531. Second, the trial court here, as in

3. The most extensive exchange occurred in relation to Juror 62:

QUESTION: I guess that I have to call you Ms. 62. And is the fact that we have to communicate in this way, where you're anonymous, does that say anything to you about what is going on in this case?
JUROR 62: I think that it's better for me. I would prefer not to have anybody know my name because of, like I said earlier, I don't think it's anybody's business. And the way that people responded to some of the jurors on the Guevera trial, I think that, again, the jurors did the best job they could. No one can say I could have done a better job because you got the answer that I would not have gotten. And so because of the—probably emotions that will be involved in this case, I prefer not to have anybody know my name.
* * *
QUESTION: * * * Have you had any occasion to see other security precautions, or the lack thereof, in this building?
JUROR 62: I don't know what it is normally like, so—I saw a lot of police officers, but I didn't know if that was normal or not.
* * *
QUESTION: Yesterday, you also said something to the effect that appreciating the anonymity of the jury selection process, especially given the emotions involved in the case, and if you could just maybe expound a little bit to what emotions you meant when you said that.
JUROR 62: Like I said earlier, that whenever a police officer is involved in a murder, that there are more emotions happening. At the same time, I think that whenever it seems to be a black versus white issue, that there are many more emotions that come out. And even with my own life, people judge you by their own experiences. And so as a juror, other people are going to be judging me by their own experiences that I can't control. And so I prefer that because no one knows anything about me before I became a juror, they won't know anything about me as a juror, and that way they cannot—their judgment shouldn't matter to me. And my judgments matter in the big picture, but my personal—me, personally, I'm an unknown person. It doesn't matter who I am or what I do. What matters is that I'm part of a collective group making a decision.

*Bowles,* gave the jury a clear instruction at the close of trial on Ford's presumption of innocence and the state's burden to prove Ford's guilt beyond a reasonable doubt. *See id.* Third, although the trial court did not specifically inform the potential jurors that their anonymity was designed to shield them from media harassment, when given the opportunity to respond to a juror's question implicating the issue of anonymity, the trial court appropriately highlighted the nonprejudicial purpose of anonymity of shielding the jurors from media harassment. *See Thomas,* 757 F.2d at 1364–65. Finally, after three juror's were selected, the trial court gave both parties the opportunity to discover the names of the jurors if they felt it was necessary or would be helpful. That the defense did not seek to avail themselves of this offer indicates that at no time did they feel that prejudice was occurring.

We conclude that the anonymous jury was impanelled for appropriate reasons, that no actual prejudice occurred; and that use of an anonymous jury did not destroy Ford's presumption of innocence, and therefore, did not deny him the fundamental right to a trial by an impartial jury. Accordingly, we conclude the trial court did not abuse its discretion when it impanelled an anonymous jury.

Ford additionally contends that the trial court violated Minn.R.Crim.P. 26.02, subd. 2 and Jury Management R. 814(b) when it impanelled an anonymous jury. Minn. R.Crim.P. 26.02, subd. 2 relates to the selection of the jury. It provides:

> Upon request the clerk of court shall furnish the parties with a list of the names and addresses of the persons on the jury panel. The parties shall also have access to such other information as the clerk has obtained from prospective jurors.

Jury Management Rule 814(b) governs records. It provides:

> The contents of juror qualification questionnaires must be made available to lawyers upon request in advance of voir dire. The court may restrict access to addresses of the prospective jurors.

Initially, we note that these two rules seem inconsistent with each other. These rules compel the court to provide the jurors' ad-dresses and simultaneously allow the court to restrict access to the address. In light of the inconsistency inherent in these rules, we believe that the trial court's modification of its initial order which allowed the parties access to the names of the jurors upon request was proper. Further, we request the Supreme Court Advisory Committee on Rules of Criminal Procedure to propose a change to these rules to effectuate consistency.

Finally, in light of our decisions in *State v. Bowles,* 530 N.W.2d 521 (Minn.1995), *State v. McKenzie,* 532 N.W.2d 210 (Minn.1995), and in this case approving of the use of anonymous juries, we further request the Supreme Court Advisory Committee on Rules of Criminal Procedure to propose a change to the criminal and jury management rules that presently exist in accordance with these decisions.

### FORD'S STATEMENTS

On November 16, 1992, Ford was arrested and charged with Officer Haaf's murder. Ford made his first court appearance and was appointed a public defender on the morning of November 17, 1992. After the hearing, on the way back to jail, Ford told a deputy that he needed to speak with a Minneapolis homicide detective "right away" about "a matter of urgency and a life and death situation." Late in the morning of November 17, 1992, two Minneapolis homicide detectives interviewed Ford without notifying either the prosecuting attorney or Ford's appointed attorney. Ford was informed of his constitutional rights and indicated he would answer the detective's questions without his attorney being present. Ford then articulated his story of the events leading up to and after Officer Haaf's murder.

On November 25, 1992, Ford gave a request slip to a deputy that said "I would like to talk to Homicide at Homicide." The same two homicide detectives again interviewed Ford without notifying his attorney or consulting the county attorney. After being informed of his constitutional rights, Ford again indicated he would talk without his attorney being present. During this inter-

view, Ford restated his recollection of the meeting at Sharif's house and his understanding of what McKenzie and Bowles were going to do.

Ford contends the trial court should have suppressed the statements he made on November 17 and November 25, 1992, because (a) the statements were not electronically recorded in violation of *State v. Scales,* 518 N.W.2d 587, 592 (Minn.1994), *reh'g denied* (Minn. Aug. 22, 1994), and (b) because the statements were taken in violation of the holding in *State v. Lefthand,* 488 N.W.2d 799 (Minn.1992).

■ First, in *Scales* we indicated the requirement to electronically record statements of persons who are in custody was prospective, not retrospective. *See Scales,* 518 N.W.2d at 593. The police took Ford's statements in 1992; thus there was no requirement of recording the interview pursuant to *Scales.* Therefore, the trial court's admission of Ford's statements did not violate our holding in *Scales.*

■ Second, Ford contends that because his appointed lawyer was neither present nor notified when he made the statements to the police, the trial court should have suppressed his statements pursuant to *State v. Lefthand,* 488 N.W.2d 799 (Minn.1992). In *Lefthand,* after the defendant had refused to leave his cell and his bed to talk to his appointed counsel, his counsel moved to suspend the criminal proceedings pending the outcome of a competency evaluation. *Id.* at 800. Prior to that evaluation occurring, the police took a statement from the defendant without notifying the defendant's counsel and, after they had contacted the prosecuting attorney who had advised they could go ahead and do it. *Id.* Although the opinion does not indicate who initiated the interview, a review of the briefs filed in that case reveals the defendant initiated contact with the police. Similarly, the opinion does not indicate if the defendant was advised of or waived his constitutional rights; however, the briefs indicate both occurred.

Minn. R. Prof. Conduct (MRPC) 4.2 provides in relevant part:

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

In *Lefthand* we noted that prosecutors are subject to Rule 4.2, MRPC. 488 N.W.2d at 801 n. 6. Based on this determination, we stated:

It is incomprehensible that the attorney-client relationship in the context of a criminal proceeding would be so cavalierly disregarded. * * * [I]n the exercise of our supervisory power to insure the fair administration of justice in this and future cases, we decide that in-custody interrogation of a formally accused person who is represented by counsel should not proceed prior to notification of counsel or the presence of counsel. Statements obtained without notice to or the presence of counsel are subject to exclusion at trial. We are mindful this requirement may cause some delay in the interrogation process; but the importance of the attorney-client relationship makes it necessary.

488 N.W.2d at 801–02 (footnote omitted). Finally, noting that "the prosecution allowed the in-custody interrogation of [the defendant] without notice to or the presence of [the defendant's] court-appointed counsel and with full knowledge that a competency examination had been ordered," we concluded that the statements obtained from the defendant in *Lefthand* should have been excluded at trial. *Id.* at 802.

Ford contends that pursuant to *Lefthand* the trial court should have suppressed his statements. We disagree. Contrary to Ford's contention, our decision in *Lefthand* did not create an automatic exclusionary rule for a violation of Rule 4.2, MRPC, by a prosecutor. Driving our decision in *Lefthand,* was our belief that the fair administration of justice had been compromised. Our determination that the material should be excluded in that case and future similar cases was not based solely on the violation of the Rules of Professional Conduct, but rather was based on the egregiousness of the gov-

ernment's action in total. The evidence was not excluded to insure compliance with the Rules of Professional Conduct. Rather, the evidence was excluded pursuant to our supervisory powers to insure the fair administration of justice in that case.

■ As we stated in *Lefthand*, statements taken in violation of Rule 4.2, MRPC, are "subject to exclusion"—exclusion is not required. 488 N.W.2d at 802. The facts in *Lefthand* were egregious. Less egregious violations do not require so severe a remedy. *See* Marc A. Schwartz, *Prosecutorial Investigations and DR 7-104(A)(1)*, 89 Colum. L.Rev. 940, 943–46 (1989) (discussing various courts' approaches to violations of analogous ethical rule, none of which have suppressed evidence for a violation of the ethical rule); Roger C. Cramton & Lisa K. Udell, *State Ethics Rules and Federal Prosecutors: The Controversies Over the Anti Contact And Subpoena Rules*, 53 U.Pitt. L.Rev. 291, 327–28 (1992) (same). The facts in the present case do not consist of similarly egregious conduct by the government to that found in *Lefthand*, therefore we conclude that the trial court appropriately admitted Ford's statements.

## SUFFICIENCY OF THE EVIDENCE

■ Ford contends the evidence was insufficient to sustain a conviction. Where there is a challenge to the sufficiency of the evidence, this court reviews the evidence in the light most favorable to the verdict to determine if the evidence was sufficient to permit the jury to reach the verdict it did. *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989).

The only direct evidence that Ford participated in a plan to kill a police officer is the testimony of Richard, an accomplice. Minn. Stat. § 634.04 (1994) provides a criminal conviction may not be based upon the testimony of an accomplice unless it is corroborated by other evidence that tends to convict the defendant of the offense. Ford argues the state did not present sufficient evidence to corroborate Richard's testimony.

■ This court has repeatedly explained the corroboration requirement as follows:

> Corroborating evidence must link or connect the defendant to the crime. It is not necessary that it establish a prima facie case of the defendant's guilt. *State v. Cooper*, 296 Minn. 48, 206 N.W.2d 356 (1973). * * * Corroborating evidence may be circumstantial or direct. *State v. Stave*, 280 Minn. 269, 158 N.W.2d 848 (1968).

> * * * Corroborating evidence may be secured from the defendant's association with those involved in the crime in such a way as to suggest joint participation, as well as from the defendant's opportunity and motive to commit the crime and his proximity to the place where the crime was committed. *State v. Mathiasen*, 267 Minn. 393, 127 N.W.2d 534 (1964). The defendant's entire conduct may be looked to for corroborating circumstances. If his connection to the crime may be fairly inferred from those circumstances, the corroboration is sufficient. *State v. Rasmussen*, 241 Minn. 310, 63 N.W.2d 1 (1954).

*State v. Scruggs*, 421 N.W.2d 707, 713 (Minn. 1988) (quoting *State v. Adams*, 295 N.W.2d 527, 533 (Minn.1980)). Circumstantial evidence corroborating an accomplice's testimony is also viewed in the light most favorable to the verdict. *State v. Norris*, 428 N.W.2d 61, 66 (Minn.1988). Corroborating evidence is sufficient if it "restores confidence in the accomplice's testimony, confirming its truth and pointing to the defendant's guilt in some substantial degree." *Scruggs*, at 713 (citing *State v. Houle*, 257 N.W.2d 320, 324 (Minn. 1977)).

A review of the record indicates that the state presented sufficient evidence to corroborate Richard's testimony. Richard testified that when he got to Sharif's apartment, Sharif was not present. This testimony is corroborated by Dawn Jones who testified that she and Monterey dropped Sharif off prior to the meeting. Richard's testimony as to who was at the meeting is corroborated by Ford who, like Richard, remembered those present as including Dawn Jones, McKenzie, Bowles, Monterey, Ford and Richard.

Richard's testimony that the plan was to shoot a cop is corroborated by Loverine Harris who testified that Richard said he had dropped Bowles and McKenzie off to "shoot a police." Moreover, the testimony of witnesses present when the shooting took place indicates the shooters went directly to the table where Officer Haaf was sitting. Finally, Dawn Jones' statement that McKenzie, while walking out of the house, said "When all this shit is over I am going to Chicago," arguably creates an inference the plan was to shoot someone. Despite Ford's statement that he thought the plan was to "make some noise" and "shoot out some windows," no other testimony exists that anyone understood the plan was anything other than to shoot a police officer.

Richard testified that Ford authored the plan to "do the Pizza Shack." Evidence corroborating this testimony is circumstantial. *See Scruggs*, 421 N.W.2d at 713 (stating that corroborating evidence may be circumstantial). Bowles' undelivered letter to Ford creates the inference that Ford was responsible for the plan. In that letter Bowles wrote: "I'm not V. Lord. This breaks our link of me and you, also that statement of you giving me orders about whatever. Ok." Witnesses testified to the importance of the hierarchy of the Vice Lords. Additionally, it is uncontested, and each witness also testified that Ford was the second in command in the Vice Lords. Finally, testimony was given that McKenzie and Bowles did not have the authority to unilaterally decide to kill a police officer. In total this testimony circumstantially supports Richard's testimony that Ford promulgated the plan to shoot an officer.

Richard testified that he dropped McKenzie off and Ford dropped Bowles off in the area of 17th Avenue and Lake Street, and then instructed Richard to circle the area to pick McKenzie and Bowles up should they run his way. This testimony is corroborated by Ford who stated he dropped Bowles off and saw him meet up with McKenzie in the area of 17th Avenue and Lake Street. Further, Loverine Harris testified that when Richard arrived at her home on the night of the murder, he looked surprised to see McKenzie and Bowles at her house because

he said he was supposed to pick them up in a "rental" car.

Richard's testimony that at the time of the murder McKenzie was wearing black Reebok tennis shoes and a cap with a gold "P" on it, and Bowles was wearing white Reebok tennis shoes is corroborated by a number of witnesses at the Pizza Shack who testified that one of the shooters was wearing a dark cap with the letter "b" on it and black tennis shoes, and the other shooter was wearing white tennis shoes. Richard's testimony is further corroborated by Loverine Harris who testified that when McKenzie and Bowles arrived at her home after the shooting, McKenzie was wearing black Reebok tennis shoes and a dark cap with a "P" on it, and Bowles was wearing white Reebok tennis shoes. Finally, the cap and the shoes were recovered from the apartment where Flournoy was staying. These items were introduced at trial.

In sum, despite minor discrepancies between Richard's description of the events surrounding the shootings and the other witnesses that testified, sufficient evidence exists to corroborate Richard's testimony. Thus, we hold that the evidence is sufficient to sustain the convictions.

### WYVONIA WILLIAMS

Next, Ford claims that the trial court erred in admitting Wyvonia Williams' statements, and that these admissions were not harmless beyond a reasonable doubt. Thus, Ford claims reversal is appropriate.

On May 19, 1993, the state called Williams to testify. Defense counsel objected, claiming her testimony would contain inadmissible hearsay. The trial court concluded Williams' testimony did not contain hearsay, reasoning:

> [W]ith respect to the hearsay portion of it, the Court has ruled with respect to codefendants, out-of-court statements, they are admissible where the codefendant is unavailable or they are refusing to testify. They are admissible if it is a statement against penal interest. Even if it inculpates the defendant in this case as well. And that is exactly the status of these statements from the Court's review.

On appeal to this court, Ford renews his objections contending that Williams' statement contained inadmissible hearsay. Specifically, Ford objects to Williams' testimony that (1) McKenzie told her that "Sharif put the hit out on the officer and that A.C. Ford was in charge of it"; and (2) that McKenzie told her that he rode in a car with Ford and Monterey to the Pizza Shack.

■ In order for the statement against penal interest hearsay exception to be applicable, the quoted witness must be unavailable. Minn. R. Evid. 804(b). Unavailability can be established by a witness deciding to invoke his/her Fifth Amendment right against self incrimination. *State v. Anderson*, 284 N.W.2d 360, 361 (Minn.1979). Although it is likely that McKenzie would have invoked his Fifth Amendment right, he was never asked if he would testify. Thus, McKenzie's unavailability was never established and thus Williams' testimony should have been suppressed.

■ Assuming McKenzie's unavailability was established, however, we believe that Williams' testimony as to what McKenzie said should not have been admitted because it was not a statement against his penal interest. The United States Supreme Court recently examined the identical federal counterpart to Minn. R. Evid. 804(b)(3) in *Williamson v. United States*, 512 U.S. ——, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). The Court said:

> In our view, the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory.

—— U.S. at ——, 114 S.Ct. at 2435. Simply, Rule 804(b)(3) only allows the admission of the self-inculpatory aspects of a statement, but not other parts of the larger statement. Thus, even if McKenzie's unavailability was established, the trial court should have suppressed Williams' statements as hearsay pursuant to *Williamson*.

4. Ford also argues that by allowing Williams to testify, the trial court violated its own pretrial order relating to witness production, and thus deprived him of a fair trial. Having concluded

■ The trial court's error in admitting Wyvonia Williams' statements relating to Ford require reversal only if the admission was not harmless beyond a reasonable doubt. *State v. Jobe*, 486 N.W.2d 407 (Minn.1992). In the past where we have found the weight of the evidence is so great that it justifies the verdict regardless of the erroneous admission, we have concluded the erroneous admission was harmless. *See id.; State v. Thieman*, 439 N.W.2d 1 (Minn.1989); *State v. Hjerstrom*, 287 N.W.2d 625 (Minn.1979). Similarly, in this case, we conclude that the weight of the evidence is so great that the admission of this information was at most harmless.[4]

### PERCY MELTON

Ford next contends that the trial court's refusal to allow his attorney to cross-examine Percy Melton on the withdrawal of his initial plea agreement was erroneous.

The trial court refused to accept the condition of Melton's initial plea agreement after an unfavorable presentence investigation. Ten days later, Melton approached Minneapolis police investigators with information relating to the Haaf murder and two other murders. Melton's plea agreement was then accepted. Ford's counsel was not allowed to cross-examine Melton in relation to the withdrawal of his initial plea agreement. The trial court based this exclusion on Minn. R. Evid. 410 and Minn. R. Crim P. 15.06. Ford contends the trial court's refusal to allow his attorney to cross-examine Melton pursuant to Minn. R. Evid. 410 and Minn. R.Crim. P. 15.06 was erroneous.

■ Minn. R. Evid. 410 provides:

> Evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or an offer to plead guilty or nolo contendere to the crime charged or any other crime or of statements made in connection with any of the foregoing pleas or offers, is not admissible in any civil, criminal or administrative action, case or proceeding whether offered

that the trial court improperly admitted Williams' statements, we decline to consider this argument.

for or against the person who made the plea or offer.

Minn. R. Evid. 410 applies to preclude the admission of a withdrawn plea agreement in the case of "the person who made the plea or offer." Contrary to Ford's contention, application of Rule 410 is not limited to defendants who have made a plea or offer. Since we conclude the trial court properly precluded the defense from cross-examining Percy Melton in relation to his withdrawn plea pursuant to Minn. R. Evid. 410, we decline to reach the issue of whether the trial court erred by not allowing Ford's attorney to cross-examine Melton pursuant to Minn. R.Crim. P. 15.06.

### PROSECUTORIAL MISCONDUCT

Ford next contends the prosecution committed reversible misconduct during his closing argument by "improperly emphasizing the notion of accountability." Ford objects to the following argument.

But I don't think anybody really thinks of risk to police officers when they're on duty, sitting in a restaurant with their back to somebody, and having two people come up and shoot them in cold blood. But that's exactly what happened on September 25th when members of the Vice Lords street gang attempted to intimidate this community when they did that to Jerry Haaf as he sat in the Pizza Shack restaurant.

Everybody who was an intentional participant in that crime must be held accountable. Justice requires it. Justice demands that.

\* \* \*

Those witnesses and names of the five defendants keep coming up. And I submit to you that the state has proven its case beyond a reasonable doubt. That there was a plan to kill a police officer. That individuals were taken out with guns to the Pizza Shack and they walked in and killed Officer Haaf in cold blood. And that this defendant intentionally participated in that. I submit to you he must be held accountable by a conviction.

\* \* \*

Now, when you folks took the oath, you agreed to follow the law. And I submit to you that the law will be given to you and I'll be asking you to follow that law, holding A.C. Ford responsible for his intentional participation in this.

\* \* \*

Now the judge will again define what "proof beyond a reasonable doubt" is. It's a self-defining term. It has to be a doubt based upon common sense, reason, not beyond the possibility of all doubt. It doesn't have to be proved to you to a mathematical certainty. The cornerstone is common sense ... common sense. Justice demands that everyone involved in this crime be held accountable.

Defense counsel made no objection to any of these statements.

■■■■ When assessing prosecutorial misconduct, the reviewing court must first examine the challenged conduct to determine whether the prosecutor erred, and then, only if there is error must the court decide whether the conduct was so prejudicial in light of the entire record that the defendant was denied a fair trial. *State v. Daniels,* 332 N.W.2d 172, 180 (Minn.1983).

In the present case, we conclude that the prosecutor's comments did not "divert the jury's attention from its true role of deciding whether the state has met its burden of proving [the] defendant guilty beyond a reasonable doubt." *State v. Montjoy,* 366 N.W.2d 103, 109 (Minn.1985). The language the prosecutor used in this case pales in comparison to the more objectionable prosecutorial statements set out in *State v. Salitros,* 499 N.W.2d 815 (Minn.1993); *State v. Post,* 512 N.W.2d 99 (Minn.1994), and *Montjoy,* 366 N.W.2d at 109. The prosecutor's comments seem less of an impassioned plea to send a message, but rather an inartful, and thus nearly problematic, method of merely stating that the law requires Ford be held responsible. Accordingly, the prosecutor did not engage in misconduct in his closing statement.

## ATTEMPTED MURDER CONVICTION

 Ford contends no evidence exists to support a conviction for attempted murder. Ford's attempted murder conviction involves the doctrine of transferred intent. In the past, this court has held: "the doctrine of transferred intent applies when the intent being transferred is for the same type of harm. If the harms are different, intent is not transferable." *State v. Merrill*, 450 N.W.2d 318, 323 (Minn.1990). Thus, this court has affirmed a trial court's application of transferred intent from a first-degree assault charge, which required proof of harm to the victim, to multiple second-degree assault charges, which did not require proof of harm to the victim. *State v. Livingston*, 420 N.W.2d 223, 229–30 (Minn.App.1988). In this case, the first-degree murder charge required proof that Haaf had died, whereas the attempted murder charge did not. Therefore, we find the trial court committed no error in its application of the doctrine of transferred intent in this case.

## BATSON CHALLENGE

Ford next contends the trial court erred by sustaining a *Batson* challenge of an alternate juror. In order to show error, Ford must show that *actual prejudice resulted* from the failure to dismiss. *State v. Stufflebean*, 329 N.W.2d 314, 317 (Minn.1983). Here the stricken juror was an alternate and thus played no role in deciding Ford's guilt. Although the alternate "could have" engaged in discussions with jurors, no evidence exists that he did. Therefore, we conclude no error occurred because actual prejudice did not result from the trial court's decision to retain the alternate.

## SENTENCING

The trial court sentenced Ford to 240 months for the attempted murder conviction. The sentence was the statutory maximum for attempted murder. For sentencing purposes the trial court merged Ford's first-degree premeditated murder conviction and his first-degree murder of a peace officer pursuant to Minn.Stat. § 609.035 (1992). For these convictions, the trial court sentenced Ford to life imprisonment for his murder convictions.

The sentence for attempted murder and the sentence for murder were to run consecutively. The court concluded the sentencing stating:

And that unless you agree to commit one-half the funds earned in prison to a victim's reparation fund, the first funds to go to the family of Jerry Haaf, during the period of the 240 months that you will serve for attempted murder, that the parole board not consider you eligible for that except as a consecutive life sentence.

That if you show some ability to be rehabilitated or cooperate with the programs that are available at Oak Park Heights under the direction of the Commissioner of Corrections, that at their discretion, that might become a concurrent sentence. But that would not be determined and is sentenced as a consecutive sentence at this time.

And that one of the conditions would be that you cooperate with their programs and that you devote one-half of your earnings to a victim's reparation fund.

If that is found in the record not to be a valid condition, then it will be left up to the Department of Corrections. But the court's intent is unless rehabilitation and cooperation is shown, that the maximum sentence be imposed in a consecutive way.

 Ford appeals the court's decisions (a) to impose the statutory maximum term for the attempted murder conviction, (b) to run the attempted murder conviction sentence and the life imprisonment conviction consecutively, and (c) to vest the Department of Corrections with the authority to modify Ford's sentence provided he paid restitution to the Haaf family. Sentencing is reviewed under an abuse of discretion standard. *Williams v. State*, 365 N.W.2d 370 (Minn. App.1985).

### A.

 First, Ford contends the trial court abused its discretion by departing upward from the presumptive term for an attempted murder conviction. To justify an aggravated sentence, the court must conclude that the particular crime for which the

defendant is being sentenced was so different in kind or degree from the typical offense as to render it more serious than most. *State v. McClay*, 310 N.W.2d 683 (Minn.1981). However,

> [i]f the evidence only supports defendant's guilt of some other offense but does not support the conclusion that the defendant committed the instant offense for which he is being sentenced in a particularly serious way, then it cannot be relied upon as a ground for departure.

*State v. Ott*, 341 N.W.2d 883, 884 (Minn. 1984).

The court concluded compelling and substantial circumstances existed to justify the departure because:

1. The defendant's conduct put a number of people at risk.

2. Mr. Lubarski is suffering psychological trauma as a result of the defendant's conduct.

3. Margaret Hapsch, who was present when Officer Haaf was murdered, is under a doctor's care for psychological treatment as a result of the defendant's conduct.

4. The defendant was the mastermind of this crime. Defendant called the group of Vice Lords together, instructed each person as to their respective roles, gave one of the gunmen a weapon and drove one of the gunmen to the Pizza Shack, the crime scene.

5. This was a crime motivated by revenge. The defendant planned this crime to get the attention of the Minneapolis Police Department, responding to the alleged mistreatment of a blind black man by the MTC police.

6. The defendant planned this crime in furtherance of organized gang activity. Defendant used his position and authority as second in command of the Vice Lords to implement this murder by ordering "foot soldiers" to commit the actual murder.

Reasons 4, 5, and 6 clearly relate to Ford's planning and execution of Haaf's murder. However, reasons 1, 2, and 3 support Ford's guilt of murder and attempted murder equal-ly. Since these reasons are not evidence that "*only* supports [Ford's] guilt of some other offense," they are allowable reasons for departure. *Ott*, at 884 (emphasis added). Accordingly, the trial court did not abuse its discretion in departing upwards.

### B.

▬ Next, Ford contends the trial court abused its discretion by ordering that the sentences for the attempted murder conviction and the first degree murder conviction should run consecutively. Minnesota Sentencing Guidelines, § II.F.02 permits consecutive sentences when the offender is convicted of multiple current felonies for crimes against different persons. Imposition of consecutive sentences must be "commensurate with culpability and not an exaggeration of defendant's criminality." *Bangert v. State*, 282 N.W.2d 540, 547 (Minn.1979) (citation omitted). Here there were two victims and the court specifically found the sentencing did not unfairly exaggerate the criminality of Ford's conduct. Accordingly, the trial court did not abuse its discretion in ordering consecutive sentences.

### C.

Finally, Ford contends the trial court's decision vesting the Department of Corrections with authority to modify his sentence to a concurrent sentence if he devotes half his earnings to a victim's reparations fund, of which the first half would go to Officer Haaf's family, was an abuse of discretion.

▬ Whereas the power to define and to fix the punishment for crimes is vested in the legislature, "the imposition of the sentence within the limits prescribed by the legislature is purely a judicial function." *State v. Olson*, 325 N.W.2d 13, 17–18 (Minn. 1982). A trial judge may not delegate its authority to impose sentence to an administrative body. *State v. Henderson*, 527 N.W.2d 827 (Minn.1995). Under Minn.Stat. § 609.15 the trial court has discretion with respect to whether multiple sentences should run concurrently or consecutively. This discretion may not be delegated to an administrative body. Moreover, under Minn.

R.Crim. P. 27.03, subd. 9, not even the trial court has authority to modify a sentence once the sentence has been executed. *State v. Hockensmith,* 417 N.W.2d 630 (Minn.1988). Accordingly, the trial court has no authority to allow the Department of Corrections to modify Ford's sentence in the manner proposed. The case, therefore, must be remanded to resentencing.

■ It further appears that the trial court made no record of the extent of the economic loss suffered by the Haaf family, something that is required before a trial court may order restitution. *See* Minn.Stat. § 611A.53 (only individuals who have incurred economic loss are eligible to receive reparations) and *State v. Fader,* 358 N.W.2d 42, 48 (Minn.1984) (holding that restitution may be awarded to compensate victim for economic loss but not as punitive damages; remanding so parties could present evidence on amount of economic loss).

Affirmed in part, reversed in part and remanded.