**STATE of Minnesota, Appellant,**

v.

**Robert Dale MILLER, Respondent.**

No. C4–98–635.

Court of Appeals of Minnesota.

Nov. 17, 1998.

Review Granted Jan. 21, 1999.

134

Hubert H. Humphrey, III, Attorney General, Paul R. Kempainen, Assistant Attorney General, St. Paul, MN, for appellant.

James C. Backstrom, Dakota County Attorney, Phillip D. Prokopowicz, Assistant Dakota County Attorney, Hastings, MN, for appellant.

William Mauzy, Douglas Olson, Mauzy Law Firm, Minneapolis, MN, for respondent.

Considered and decided by TOUSSAINT, P.J., and DAVIES and PETERSON, JJ.

## OPINION

TOUSSAINT, Chief Judge.

Respondent Robert Dale Miller was charged with 24 counts of aiding and abetting in the preparation and filing of fraudulent landfill abatement fee reports in violation of Minn.Stat. § 289A.63, subd. 2(b) (1996). The state appeals from a pretrial order (1) suppressing voluntary non-custodial statements obtained by investigators from Miller at the prosecutor's direction without notice to counsel; (2) suppressing evidence gathered by civil investigators under auspices of a civil regulatory investigation when, in fact, they were conducting a criminal investigation; and (3) forbidding the state from introducing evidence of the statutory waste-conversion rate set forth in Minn.Stat. § 115A.918, subd. 2a (1996), on relevancy grounds. We reverse the trial court's ruling suppressing Miller's statement and evidence gathered by Dakota County Department of Environmental Management (DCEM) agents. We affirm, however, the trial court's ruling prohibiting the state from referring to Minn.Stat. § 115A.918, subd. 2a.

## FACTS

Burnsville Sanitary Landfill (BSL) is owned and operated by Edward Kraemer & Sons. Respondent Robert Dale Miller was general manager of BSL between June 1993 and May 1995. This case began in June 1994 as a civil regulatory investigation into the possibility that BSL was underreporting its landfill abatement fees obligations.[1]

Between June 1994 and January 1995, agents of the Dakota County Department of Environmental Management (DCEM) observed BSL's operations closely. In August 1994, they requested that a county prosecutor be assigned to the civil investigative team to advice DCEM agents on the criminal ramifications of the investigation.

On December 5, DCEM investigators met with Miller and other landfill employees to discuss procedures BSL used for calculating and reporting its landfill abatement fees. At this meeting, they learned of BSL's use of a 1.8 waste-conversion rate that was not authorized by statute. They also reviewed BSL records and discovered discrepancies between the records they reviewed and their own observations and records.

On January 10, 1995, a DCEM agent interviewed Ed Ristow, the scale house operator. Ristow confirmed that BSL had in fact been using a 1.8 conversion rate for demolition and construction waste instead of the statutorily required 3.3 rate. Based on this information, DCEM agents concluded that BSL was fraudulently underreporting the volume of waste it was receiving and underpaying the state. On January 20, 1995, the DCEM referred the case to the Dakota County Attorney's Office for possible criminal action.

Between January and May 1995, criminal investigators conducted additional surveillance and evidence gathering. On May 11, they executed a search warrant on BSL's premises. Miller arrived at the landfill while the search was in progress and agreed to give Minnesota Bureau of Criminal Apprehension (BCA) agent Knefelkamp a brief statement. Before Knefelkamp took Miller's statement, Officer Forbord, the leader of the search warrant execution team, showed Miller a copy of the warrant and allowed him to fax it to his attorney. He also told Miller that he was not under arrest and was free to leave at any time. Agent Knefelkamp repeated these warnings to Miller before taking his statement. Miller's statement was brief and covered procedures used at the landfill and the responsibilities of various

---

1. Minnesota law requires sanitary landfills to pay landfill abatement fees for environmental protection purposes. Minn.Stat. § 473.843, subd. 1 (1996). Fees are determined by the weight or volume of the waste collected. *Id.* Landfills collect fees from haulers and turn them over to the Minnesota Commissioner of Revenue pursuant to Minn.Stat. § 473.843, subd. 3 (1996). Minn.Stat. § 473.843, subd. 1 authorizes landfill abatement fees payable to the state. Minn.Stat. §§ 115A.919, subd. 1(a), 115A.921, subd. 1 (1996) authorize landfill abatement fees payable to counties and cities.

employees. Miller did not ask to speak to his attorney during the course of the interview.

While Miller was being interviewed, his attorney, Joe Dixon, contacted Officer Forbord by phone and advised him that he represented BSL and its employees. He asked that investigators not speak to Miller or other employees. Dixon then drove over to the landfill and asked to speak with his client. After consulting with the county attorney's office, Officer Forbord did not permit Dixon either to speak to his client or enter the premises. He allowed Miller's interview to proceed and did not alert Miller that Dixon wanted to speak with him.

On July 9, 1997, the Dakota County Attorney filed a complaint charging Miller with aiding and abetting in the preparation of fraudulent monthly reports filed with the Minnesota Commissioner of Revenue. Specifically, the complaint alleges that between May 1993 and April 1995 Miller fraudulently underreported the amount of fees BSL owed the government by (1) charging certain haulers a flat fee per box of waste received rather than a fee based on the actual weight or volume of the waste collected; and (2) using a rate of 1.8 cubic yards per ton of waste to convert the net weight of demolition and construction waste from tons to cubic yards, rather than the statutorily required 3.3–cubic–yards–per–ton rate. According to the complaint, the use of both the flat fee and the 1.8 waste-conversion rate resulted in unpaid fees to the state, the county, and the city in excess of 1.4 million dollars.

Miller moved to suppress (1) statements he and other BSL employees made to DCEM agents in December 1994 and January 1995 on the ground that the DCEM abused its investigatory powers by using its agents to gather information for the county attorney's criminal division; (2) the statement he gave agent Knefelkamp on the ground that it was obtained in violation of Rule 4.2 of the Minnesota Rules of Professional Conduct; and (3) any reference to the 3.3 waste-conversion rate set forth in Minn.Stat. § 115A.918, subd. 2a, on relevancy grounds.

The trial court granted Miller's motion. This appeal followed.

## ISSUES

1. Does Rule 4.2 of the Minnesota Rules of Professional Conduct require the exclusion of voluntary, non-custodial statements investigators obtained at the direction of the prosecutor and without notice to counsel from a suspect who had not been formally charged?

2. Should evidence gathered by civil investigators for the county's criminal investigation be suppressed on the ground that the civil investigation was merely a facade for a criminal investigation?

## ANALYSIS

■ To prevail on a pretrial appeal, the state must establish clearly and unequivocally that the trial court's rulings were clearly erroneous and will have a critical impact on the outcome of the trial unless reversed. *State v. Webber*, 262 N.W.2d 157, 159 (Minn. 1977). We first address whether the trial court's rulings have a critical impact on the trial's outcome.

### I.

■ A ruling has critical impact if it significantly reduces the likelihood of a successful prosecution. *State v. Joon Kyu Kim*, 398 N.W.2d 544, 551 (Minn.1987). The suppression of evidence reduces the likelihood of a successful prosecution when its effect is "to seriously impede, although not to completely foreclose, continuation of the prosecution." *Id.*

■ The trial court's rulings suppressing Miller's statement to agent Knefelkamp will have a critical impact on the successful prosecution of this case unless reversed. The statement Miller gave agent Knefelkamp establishes Miller's personal knowledge of the landfill business, the abatement fees requirement, and the way in which BSL calculated and reported those fees. Because Miller is charged with *knowingly* aiding and abetting in the preparation and filing of fraudulent·fee reports, the suppression of his own statements regarding what he knew about BSL's reporting practices will reduce the likelihood of a successful prosecution. Even if, as Mil-

ler argues, the state could obtain evidence of what Miller knew from other sources, this evidence does not make Miller's own admissions, which establish his knowledge, any less critical to a successful prosecution of this case.

■ The evidence DCEM agents obtained over the course of their investigation is also critical to the successful prosecution of this case. Between June 1994 and January 1995, DCEM agents observed BSL's collection practices and reviewed scale house records, fee reports filed with the county, and documents obtained from haulers. On the basis of this evidence, they were able to estimate the amount of demolition and construction waste BSL underreported. Miller is charged with fraudulently underreporting BSL's abatement fees obligations. The evidence gathered by the DCEM, therefore, goes to the heart of the state's case against Miller and is critical to a successful prosecution. Miller's argument that the evidence is not critical because it affects only 6 of the 24 charges alleged in the complaint is thus without merit.

■ By contrast, the trial court's ruling prohibiting the state from referring to the waste-conversion rate set forth in Minn.Stat. § 115A.918, subd. 2a will not affect the successful prosecution of this case for the state may establish the applicable conversion rate by referring to Minn.Stat. § 473.843, subd. 1 instead. We therefore affirm this ruling.

## II.

■ The state first challenges the trial court's ruling suppressing the statement Miller gave agent Knefelkamp on the ground that it was obtained in violation of Rule 4.2 of the Minnesota Rules of Professional Conduct. Although the record supports the trial court's finding that state agents knowingly talked to Miller without notice to counsel and despite counsel's objection, the trial court's suppression of Miller's statement is erroneous because the prosecutor's conduct in this case was not egregious enough to have compromised the fair administration of justice.

Rule 4.2 of the Minnesota Rules of Professional Conduct provides as follows in relevant part:

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Minn. R. Prof. Conduct Rule 4.2 (1996). The comment to the rule provides that the rule "also covers any person, whether or not a party to a formal proceeding, who is represented by counsel concerning the matter in question." *Id.* cmt.

■ Prosecutors are subject to Rule 4.2. *State v. Lefthand,* 488 N.W.2d 799, 801 n. 6 (Minn.1992). Thus, statements taken by prosecutors in violation of the rule may be excluded from evidence. *State v. Ford,* 539 N.W.2d 214, 225 (Minn.), *rehearing denied* (Nov. 15, 1995), *cert. denied,* 517 U.S. 1125, 116 S.Ct. 1365, 134 L.Ed.2d 530 (1996). Exclusion, however, is not required. *Id.* Exclusion of evidence is warranted only when the prosecutor's conduct is so egregious that it compromises the fair administration of justice. *Id.* at 224–25.

In determining whether a prosecutor's conduct is egregious, Minnesota courts have considered whether the communication with a person represented by counsel was custodial, whether the person had been formally charged, and whether the communication was conducted with the prosecutor's knowledge. *See, e.g., Lefthand,* 488 N.W.2d at 801–02. In *Lefthand,* the court upheld the exclusion of statements obtained by police in violation of rule 4.2 where the defendant was in custody, had been formally charged, and had been ordered to submit to a competency examination. *Id.* The court premised its holding on its "strong[ ] disapprov[al] of in-custody interrogations if the defendant is represented by counsel and counsel has not had an opportunity to be present at the questioning." *Id.* at 801 (quoting *State v. Renfrew,* 280 Minn. 276, 280, 159 N.W.2d 111, 113 (1968)). Indeed, the court expressly decided, pursuant to its supervisory power to insure the fair administration of justice, that *"in-custody in-*

*terrogation of a formally accused person* who is represented by counsel should not proceed prior to notification of counsel or the presence of counsel" and "statements obtained without notice to or the presence of counsel are subject to exclusion." *Id.* (emphasis added).

 Not all custodial statements obtained without notice to or the presence of counsel, however, warrant exclusion. *See, e.g., Ford,* 539 N.W.2d at 224 (allowing voluntary custodial statements taken from a formally charged defendant without notice to counsel, where defendant's competency was not in issue and the prosecutor had not been notified of the interrogation). Cases cautioning against a prosecuting attorney's communication with a suspect without notifying his or her lawyer involve, without exception, custodial or post-indictment questioning of a criminal suspect by the government's attorney, law enforcement officer, or retained psychiatrist. *See, e.g., United States v. Carlson,* 423 F.2d 431, 440–443 (9th Cir.1970)(voluntary post-indictment statements); *United States v. Four Star,* 428 F.2d 1406, 1407 (9th Cir.1970)(voluntary custodial statements); *United States v. Smith,* 379 F.2d 628, 633 (7th Cir.1967)(voluntary custodial statements); *Lee v. United States,* 322 F.2d 770, 777 (5th Cir.1963)(post-indictment voluntary statement).

 Although the prosecutor's conduct in this case violated the express language of Rule 4.2, it did not compromise the fair administration of justice and does not, therefore, warrant exclusion of Miller's statement. Miller was not in custody, had not been formally charged, and his competency was not in question. Here, the communication was not custodial or post-indictment. Moreover, Miller was advised of his rights and was told that he could leave at any time. Instead of leaving, Miller deliberately and knowingly chose to talk to agent Knefelkamp and to forego the assistance of counsel. For these reasons, the trial court erred as · a matter of law in concluding that the prosecutor's conduct was egregious enough to warrant suppression of Miller's statement. We reverse.

## III.

The state next contends that the trial court erred in suppressing all evidence gathered by DCEM's investigators on the ground that they "wrongfully continued the facade of a civil investigation," when in fact they were gathering evidence to be used by the county attorney in its criminal investigation. We agree with the state.

 When faced with claims of governmental trickery and deceit, the reviewing court's task is to "examine the entire record and make an independent determination of the ultimate issue of voluntariness." *United States v. Serlin,* 707 F.2d 953, 956 (7th Cir.1983)(quoting *Beckwith v. United States,* 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976)). Where investigators fail to apprise a defendant of the nature of an investigation, the court may suppress evidence obtained during the course. of that investigation only if (1) the government had firm indications of fraud by the defendant; (2) the record contains clear and convincing evidence that the government "affirmatively and intentionally misled the defendant;" and (3) the government's conduct violated the defendant's constitutional rights. *United States v. Grunewald,* 987 F.2d 531, 534 (8th Cir.1993), *rehearing denied* (Apr. 15, 1993). The burden of proof is on the movant. *United States v. Meier,* 607 F.2d 215, 217 (8th Cir.1979), *cert. denied* 445 U.S. 966, 100 S.Ct. 1658, 64 L.Ed.2d 243 (1980).

 Here, Miller has failed to meet his burden of proving that the evidence satisfies the *Grunewald* test. First, the record does not support the trial court's finding that the DCEM had "firm indications of fraud" in November 1994. By November 1994, DCEM agents had observed the operations at BSL, had · noticed discrepancies between the amount of waste BSL *appeared* to be collecting and the amount of waste it was logging, and had requested that an attorney from the county attorney's criminal division be assigned to the civil investigative team to advise them on the criminal ramifications of their investigation. They had also learned that the U.S. Attorney's Office was investigating BSL on an unrelated matter.

DCEM agents obtained the first indication that BSL *may* have engaged in fraud when BSL employees referred to the 1.8 waste-conversion rate during a meeting on December 5, at which DCEM agents were also able to review BSL records for the first time. Their suspicion of fraud was confirmed on January 10, 1995, when Ed Ristow, the scale house manager, told DCEM agents that BSL had in fact been using a 1.8 waste conversion rate, instead of the statutorily required 3.3 rate, for one and one-half months. Only at this point did the DCEM have indications of fraud sufficient to warrant referral of the case to the county attorney's office for possible criminal prosecution. The record, therefore, does not support the trial court's finding that the DCEM had "firm indications of fraud" by November 1994.

Nor does the record support the court's finding that the state "affirmatively and intentionally misled the defendant" as to the true nature of the investigation. *Grunewald*, 987 F.2d at 534. State investigators in this case made no representations, affirmative or otherwise, about the nature of their inquiry. They could not have misled Miller as to the nature of their investigation because the subject was never discussed. Miller has identified no representations by state agents that, if proven, would be affirmatively misleading. *Cf. United States v. Tweel*, 550 F.2d 297, 298 (5th Cir.1977) (IRS agent told defendant he was conducting a civil audit and no "special agent" was involved in the investigation, when, in fact, the audit was being conducted at the request of the Organized Crime and Racketeering section of the justice department).

 Absent an affirmative misrepresentation of the true nature of an inquiry, the mere failure to inform a suspect that an investigation may result in criminal charges does not justify suppression of evidence, unless the suspect inquires about the nature of the investigation and the state does not respond to mislead the suspect intentionally. *Tweel*, 550 F.2d at 299. Silence can be equated with fraud only when government agents (1) have a legal or a moral duty to speak; or (2) fail to answer an inquiry intentionally to mislead a suspect. *United States*

*v. Prudden*, 424 F.2d 1021, 1032 (5th Cir.), cert. denied, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970).

Here, the state investigators had no legal or moral duty to speak. *See, e.g., Prudden*, 424 F.2d at 1032 (where agents pursued their announced intention to audit records in defendant's possession in a businesslike manner, court stated "we are unable to say that they had a duty to do more or less under the circumstances disclosed by the record"). As in *Prudden*, the state in this case pursued its announced intention to review records and interview BSL employees lawfully and in a businesslike manner. The state, therefore, had no additional legal or moral duty to advise Miller or prevent him from further engaging in criminal conduct.

Additionally, Miller has failed to present any clear and convincing evidence that the state's silence was intended to mislead. *See Meier*, 607 F.2d at 217 (evidence that agent failed to respond to defendant's statement that IRS investigation had been prompted by postal inspection held insufficient to establish that IRS agents fraudulently concealed the purpose of the investigation from defendant). The record shows only that the civil investigation initiated by the DCEM was transformed into a criminal investigation without Miller's knowledge. This evidence, without more, is insufficient to establish intent to mislead and does not warrant suppression of evidence in a criminal trial.

Finally, Miller does not claim that the state's conduct violated any of his constitutional rights. Under the *Grunewald* three-factor test, therefore, the trial court erred in suppressing all evidence gathered by DCEM agents.

## DECISION

The trial court erred in suppressing voluntary non-custodial statements investigators obtained at the prosecutor's direction, without notice to counsel, from a suspect who had not been formally charged. Although the prosecutor's conduct violated the express language of Rule 4.2 of the Minnesota Rules of Professional Conduct, it was not egregious enough to have compromised the fair admin-

istration of justice and thereby warrant suppression of evidence in a criminal trial. We therefore reverse.

The trial court also erred in suppressing evidence obtained by civil investigators allegedly under auspices that they were conducting a civil regulatory investigation when, in fact, they were conducting a criminal investigation. The mere failure of civil investigators to inform a suspect that an investigation may result in criminal charges does not justify suppression of evidence in a criminal trial absent an affirmative misrepresentation or silence as to the nature of the investigation intended to mislead the suspect. We therefore reverse.

The trial court's ruling prohibiting the state from referring to Minn.Stat. § 115A.918, subd. 2a does not have a critical impact on the successful prosecution of this case and is, therefore, affirmed.

**Reversed in part, affirmed in part.**