STATE of Minnesota, Respondent,

v.

Robert Dale MILLER, petitioner, Appellant.

No. C4–98–635.

Supreme Court of Minnesota.

Sept. 2, 1999.

William J. Mauzy, Douglas H.R. Olson, Matthew D. Forsgren, Mauzy Law Firm, Minneapolis, for appellant.

Michael A. Hatch, Atty. Gen., Paul R. Kempainen, Asst. Atty. Gen., St. Paul, James C. Backstrom, Dakota County Atty., Phillip D. Prokopowicz, Asst. Dakota County Atty., Hastings, for respondent.

Paul R. Scoggin, Asst. Hennepin County Atty., Minneapolis, amicus curiae.

## OPINION

STRINGER, Justice.

In this criminal matter involving charges of aiding and abetting the filing of false landfill abatement fee reports, appellant Robert Dale Miller challenges the admissibility of a statement he made to law enforcement during the execution of a search warrant at appellant's place of employment on the grounds that the statement was taken in violation of Minnesota Rules of Professional Conduct 4.2 (MRPC 4.2) prohibiting an attorney from communicating with an opposing party known to be represented by counsel without obtaining the consent of the party's attorney. Following an omnibus hearing the trial court issued an order partially excluding the statement. The state appealed arguing that MRPC 4.2 does not apply to non-custodial voluntary statements taken from an individual who had not been formally charged. The court of appeals reversed the exclusionary rul-

ing, holding that the violation of MRPC 4.2 did not "compromise the fair administration of justice" and therefore did not warrant exclusion. *State v. Miller,* 586 N.W.2d 133, 139 (Minn.App.1998). We reverse and reinstate the partial suppression order of the trial court.

The Dakota County Office of Environmental Management (DCEM) received a complaint on June 22, 1994 that the Burnsville Sanitary Landfill (BSL) was giving certain waste haulers favorable waste disposal rates. An investigation was launched after DCEM personnel observed discrepancies between the amount of waste reported by BSL and the amount appearing to be coming and going from the landfill. Assistant Dakota County Attorney Jay Stassen was assigned to advise the county on the civil aspects of the investigation. In August of 1994, DCEM asked attorney Stassen whether there might be criminal implications to the investigation. Because attorney Stassen could not give advice on criminal law, Assistant County Attorney Pat Skelly, a prosecutor with the Dakota County Attorney's Office, was assigned to consult with the civil investigators on possible criminal charges. Skelly advised the DCEM in the fall of 1994 that there was insufficient information to begin a criminal investigation at that time. Although Stassen remained the county attorney in charge of the civil investigation, Skelly was consulted on criminal matters.

In August Stassen learned that the Internal Revenue Service (IRS) and the United States Attorney's Office were investigating the fee payment arrangements at BSL. The IRS was also investigating appellant's federal income tax liability and was aware that attorney William Mauzy claimed to represent appellant in the tax matter. The record is unclear as to how much information was given to Stassen or Skelly about the IRS investigation, but according to the county's records, both county attorneys met with representatives of the United States Attorney's Office on November 4, 1994 regarding the federal tax investigation of five waste haulers and "one principal of the Burnsville Landfill," presumably appellant.

In December of 1994 Stassen and other county representatives met with BSL staff and an associate from the office of attorney Joe Dixon, the legal counsel for BSL and their parent company, Edward Kraemer and Sons,[1] to discuss BSL's procedures for calculating and reporting the landfill abatement fee required by Minn. Stat. § 473.843, subd. 1 (1998). Appellant attended this meeting in his capacity as BSL's general manager.

During the December meeting BSL representatives made reference to using a waste conversion factor of weight to volume of 1.8 but later denied using anything other than the statutorily required 3.3 conversion factor. *See* Minn.Stat. § 115A.918 (1998); Minn.Stat. § 473.843, subd. 1 (1998). County staff subsequently requested and photocopied numerous BSL records and became convinced that BSL was underreporting the amount of waste received and hence underpaying the surcharge due to the state, county and city.

Following interviews with haulers and a review of BSL records, the case was officially forwarded to the Dakota County Attorney's Office for criminal investigation on January 20, 1995. Attorney Skelly remained in charge of the criminal investigation and Sergeant Jeffrey Nylen of the Dakota County Sheriff's Office was assigned to supervise and coordinate it. In early May, Nylen applied for a warrant and it was issued to search BSL for documents and other information related to the payment of the surcharge. An organizational meeting was held on May 9, 1995 attended by approximately 60 representatives of the law enforcement agencies that

---

1. Dixon had represented Kraemer for years, a fact apparently known to the Dakota County Attorney's Office.

were to be involved in executing the search warrant, including the IRS, the Minnesota Department of Revenue, the Minnesota Attorney General's Office and Bureau of Criminal Apprehension (BCA), police departments from Hastings, Mendota Heights, Inver Grove Heights, Lakeville, Apple Valley and Eagan as well as the Dakota County Sheriff's Department, Dakota County Attorney's Office and DCEM. Both Attorneys Skelly and Stassen attended the meeting. Detective Bill Forbord of the Lakeville Police Department was in charge of the execution of the warrant and each person who was to be involved was given an assignment. BCA Agent David E. Knefelkamp was assigned to "interview team one" with specific instructions to interview appellant from a list of questions provided by Dakota County law enforcement.

The execution of the search warrant began at approximately 8:45 a.m. on May 11, 1995 and involved a team of twelve law enforcement officers – ten at the BSL office and two at the scale house. Appellant was not yet in the BSL office when the search began but was notified of the search by BSL staff and spoke to one of the investigators on the telephone. BSL staff also contacted attorney Dixon. Appellant arrived at the office at approximately 9:30 a.m. and was presented with a copy of the search warrant but was also informed that he was not under arrest. Forbord described appellant as "very cooperative." When Knefelkamp introduced himself to appellant and asked if he could speak with him, appellant agreed, but first asked and was given permission by Forbord to fax the warrant to Dixon. Knefelkamp testified at the omnibus hearing that appellant also asked to speak with "his attorney" prior to faxing the warrant to Dixon, and appellant called Dixon's office to let them know a fax was coming.

The interview between Knefelkamp and appellant was tape-recorded and lasted from 9:37 a.m. until 10:17 a.m. Knefelkamp informed appellant again that he was not under arrest and that the officers were "simply gathering information." At no time during the interview did appellant again request to speak with an attorney.

While appellant was being interviewed, Dixon contacted Forbord by telephone[2] and advised him that he represented BSL and its employees and asked that no statements be taken from employees without him being present. Dixon asked to speak with appellant and was informed that he was being interviewed. Forbord refused to terminate appellant's interview or to notify appellant that Dixon wanted to speak with him. Forbord also informed Dixon that he would not be permitted in the office area because it was considered a crime scene while the warrant was being executed. Dixon expressed his doubts that Forbord could keep him off the premises and was referred to the Dakota County Attorney's Office. Forbord testified at the omnibus hearing that he contacted the Dakota County Attorney's Office after his conversation with Dixon to ask "whether or not Dixon could come in the building and also if I needed to interrupt" appellant's interview, and that he was told by Skelly, in response, that he did not need to terminate the interview or allow Dixon on the premises. Dixon also called Skelly and was told that he would not be allowed inside the building and would not be allowed to speak with employees unless they requested his presence.

Dixon met Forbord in the parking lot when Dixon arrived at the office at approximately 11 a.m. and again told Forbord that he represented the company and its employees. Forbord responded that Dixon would not be permitted to enter the office building or speak with any of the

---

2. The time of the telephone call is unclear from the record: Officer Forbord's report said the phone call occurred at 10:19 a.m., two minutes after the interview was over, but

Forbord testified at the omnibus hearing that the interview was in progress when Dixon called.

employees. Forbord did tell Dixon however, that any employee who requested the presence of counsel would not be interviewed.

Twenty-four charges of tax fraud were brought against appellant individually in June of 1997 alleging that he fraudulently prepared and filed Landfill Abatement Fee Reports with the Minnesota Commissioner of Revenue in violation of Minn.Stat. §§ 289A.63, subd. 2(b); 609.03; 609.05; and 609.101 (1998). The complaint alleged that the fraud resulted in an underpayment of $1.4 million in landfill abatement fees.

Following an omnibus hearing on January 12 and 15, 1998, the trial court issued an order suppressing the portion of appellant's statement taken after Dixon called BSL and Forbord refused to stop appellant's interview. Without reference to MRPC 4.2 the trial court determined that the knowledge of the County Attorney's office and the IRS agents that appellant was represented by counsel was imputed to the remaining investigators executing the search warrant under the "collective knowledge theory" articulated in *State v. Riley*, 568 N.W.2d 518, 523 (Minn.1997). The trial court held that "the government may not go behind the backs of corporate attorneys and contact and interview employees" of the corporation, citing *United States ex rel. O'Keefe v. McDonnell Douglas Corp.*, 132 F.3d 1252 (8th Cir.1998).

The state appealed to the court of appeals on several grounds.[3] *Miller*, 586 N.W.2d at 138–39. The court ruled that suppression of appellant's statement would have a critical impact on the successful prosecution of the case unless reversed,[4] and then went on to hold that the prosecutor's conduct "violated the express lan-

guage" of MRPC 4.2 because "state agents knowingly talked to [appellant] without notice to counsel and despite counsel's objections." *Id.* The court held that exclusion was a proper remedy only if the prosecutor's conduct was "egregious enough to have compromised the fair administration of justice." *Id.* at 140–41. The court concluded that the conduct was not so egregious as to warrant exclusion because the interview was noncustodial, appellant had not been charged and his competency was unquestioned. *Id.* at 138–39 (examining factors found to be determinative in *State v. Lefthand*, 488 N.W.2d 799, 801 n. 6 (Minn.1992) and *State v. Ford*, 539 N.W.2d 214, 225 (Minn.1995), *cert. denied*, 517 U.S. 1125, 116 S.Ct. 1362, 134 L.Ed.2d 529 (1996)).

On appeal here appellant argues that that the conduct of the prosecution clearly violated the express language of MRPC 4.2, as well as Minnesota and federal case law, and that the behavior of the prosecution was egregious and that the trial court was in the best position to make such a determination and impose the proper remedy. The state cross-appeals the court of appeals' holding that MRPC 4.2 was violated, arguing that the conduct of the prosecutors falls within the "authorized by law" exception to MRPC 4.2, and asserts that the entire statement given by appellant is admissible.

I. Scope and Application of MRPC 4.2

Appellant urges us to reverse the court of appeals and reinstate the trial court's order partially suppressing the statement given by appellant to Knefelkamp on the basis that the interview was conducted in clear violation of MRPC 4.2. The Rule provides:

3. In addition to addressing the alleged Rule violation, the court of appeals reversed the trial court's order suppressing all evidence prepared as part of the DCEM civil investigation, and rejected the argument that the government intentionally misled appellant about the nature of the investigation. *Miller*, 586 N.W.2d at 140. The portion of the trial court's order prohibiting any reference to Minn.Stat. § 115A.918, subd. 2a (1996) was affirmed. *Id.* at 138. These holdings are not appealed.

4. The court of appeals' determination of critical impact was not appealed.

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

The comment to the Rule clarifies that "[c]ommunications authorized by law include, for example, the right of a party to a controversy with a government agency to speak with government officials about the matter." The comment also references circumstances involving a corporate client:

> In the case of an organization, the Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. * * * This Rule also covers any person, whether or not a party to a formal proceeding, who is represented by counsel concerning the matter in question.

MRPC 4.2 cmt.[5]

 The purpose of a disciplinary "no-contact rule" is generally considered to be to protect the represented individual from "the supposed imbalance of legal skill and acumen between the lawyer and the party litigant." *Massiah v. United States,* 377 U.S. 201, 211, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) (White, J., dissenting).[6] It serves "to prevent situations in which a represented party may be taken advantage of by adverse counsel; the presence of the party's attorney theoretically neutralizes the contact." *Frey v. Dept. of Health & Human Svcs.,* 106 F.R.D. 32, 34 (E.D.N.Y. 1985) (quoting *Wright by Wright v. Group Health Hosp.,* 103 Wash.2d 192, 691 P.2d 564, 567 (1984)). The same concerns apply to a corporate party:

> Just as an adversary's attorney may take advantage of an individual party either by extracting damaging statements from him, by dissuading him from pursuing his claim, or by negatively influencing his expectations of succeeding on the merits, the same may occur in the case of an institutional or corporate party.

*University Patents, Inc. v. Kligman,* 737 F.Supp. 325, 327–28 (E.D.Pa.1990).

---

**5.** The origin of the no-contact rule can be traced to an 1836 treatise, which declared "I will never enter into any conversation with my opponent's client, relative to his claim or defence, except with the consent, *and* in the presence of his counsel." 2 D. Hoffman, A Course of Legal Study Addressed to Students and the Profession Generally 771 (2d ed. Baltimore 1836) (emphasis in original), *as quoted in* John Leubsdorf, *Communicating With Another Lawyer's Client: The Lawyer's Veto and the Client's Interest,* 127 U. Pa. L.Rev. 683, 684 (1979) (hereinafter Leubsdorf). It was not until the twentieth century however that the rule became generally accepted. *See* Leubsdorf at 684. The rule was part of the American Bar Association's 1908 Canon of Ethics, and was carried forward into the ABA Code of Professional Responsibility and the Model Rules of Professional Conduct. *Id.* at 685. The Minnesota Rules of Professional Conduct were patterned after the ABA Model Rules of Professional Conduct, and were formally adopted in 1985 to replace the Minnesota Code of Professional Responsibility. *Petition of Weiblen,* 439 N.W.2d 7, 9 n. 2 (Minn.1989). The previous rule, DR 7–104, provided that "[d]uring the course of his representation of a client a lawyer shall not: * * * [c]ommunicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so." DR 7–104(A)(1), Minn.Code of Prof. Resp. (1984).

**6.** *But see* Leubsdorf at 686–87 (listing other rationales, including proper functioning of the legal system, "the danger that lawyers will bamboozle parties unprotected by their own counsel," and potential conflicts of interest).

The ambit of MRPC 4.2 is not to be confused with an individual's constitutional right to counsel.[7] In contrast to protecting the client's right *to* counsel, MRPC 4.2 protects the right *of* counsel to be present during any communication between the counsel's client and opposing counsel. The focus of MRPC 4.2 is on the obligation of attorneys to respect the relationship of the adverse party and the party's attorney. *See United States v. Lopez*, 4 F.3d 1455, 1462 (9th Cir.1993). The right belongs to the party's attorney, not the party, and the party cannot waive the application of the no-contact rule – only the party's attorney can approve the direct contact and only the party's attorney can waive the attorney's right to be present during a communication between the attorney's client and opposing counsel. *See id.*

Since the Minnesota Rules of Professional Conduct apply only to attorneys, implicit in application of MRPC 4.2 is that in the absence of conduct attributable to an attorney, MRPC 4.2 does not apply: the Rules of Professional Conduct "are designed to provide guidance to lawyers and to provide a structure for regulating conduct" of lawyers. MRPC, Scope. The Rules further provide however, that a lawyer is responsible for conduct of any associated nonlawyer if the lawyer orders or ratifies the nonlawyer's conduct. MRPC 5.3(c)(1).

Applying these principles to the matter at hand, we first consider whether there was sufficient evidence for the trial court to conclude that the Dakota County Attorney's Office ordered or ratified Detective Forbord's conduct when Forbord refused to terminate the interview of appellant, Dixon's client, over Dixon's objections, and prevented Dixon from being present at appellant's interview. We conclude that there was. Because of their previous involvement with the civil investigation, both attorneys Stassen and Skelly knew or at least had clear reason to know that appellant, a target to be interviewed during the execution of the search warrant, was represented by counsel. Skelly was directly informed of Dixon's representation of appellant and Dixon's objections to the proceedings in telephone conversations during the execution of the warrant, and Skelly affirmed and ratified Forbord's actions in refusing to terminate the interview and preventing Dixon from communicating with appellant. We therefore conclude that the Minnesota Rules of Professional Conduct apply and that Skelly's conduct violated MRPC 4.2.

## II. The "Authorized by Law" Exception to MRPC 4.2

The state argues that Skelly was acting within the "authorized by law" exception to the Rule when he advised Forbord on the legality of appellant's interview and that MRPC 4.2 does not apply to voluntary, noncustodial investigative interviews conducted during the course of a legitimate investigation. Appellant disagrees, arguing that the prosecutors in this case violated MRPC 4.2 because they knew appellant was represented by counsel and that the direct contact with appellant does not fall within the "authorized by law" exception.

At the outset we should note that our case law clearly establishes that MRPC 4.2 applies to prosecutors involved in custodial interviews of a charged suspect. In *Lefthand* the police interviewed a jailed defendant, whose competency was in question, "with permission from the prosecutor" but without notice to or the permission of the defendant's counsel. 488 N.W.2d at 800. The statements were admitted at trial and the defendant was convicted. *Id.* In reversing the conviction we expressed our strong disapproval of custodial interrogations of a defendant without notice to counsel, *id.* at 801, and rejected

---

7. *See* Edwin J. Butterfoss and Lisa J. Burkett, *Extending the Guiding Lefthand of Counsel: The Minnesota Supreme Court Provides Protec-* *tion Against Uncounseled Waivers of the Right to Counsel During Interrogations,* 17 Hamline L.Rev. 307, 325 (1993).

the state's contention that MRPC 4.2 did not apply to prosecutors:

> We are also somewhat dismayed by state's counsel's belief that prosecutors are beyond the reach of our professional conduct rules, specifically Rule 4.2, Minn. R. Pro. Conduct. We note that the majority of jurisdictions presented with the issue have held that communicating with defendants who are represented by counsel violates the applicable rules of professional conduct.

*Id.* at 802 n. 6 (citations omitted). "[I]n the exercise of our supervisory power to insure the fair administration of justice in this and future cases," we held that "in-custody interrogation of a formally accused person who is represented by counsel should not proceed prior to notification of counsel or the presence of counsel," and that statements so obtained were subject to exclusion at trial. *Id.* at 801–02.

More recently we addressed the application of MRPC 4.2 in *Ford.*[8] The defendant in *Ford* had made his first court appearance and a public defender had been appointed to represent him when he told a sheriff's deputy that he wanted to talk to a homicide detective " 'right away' about 'a matter of urgency and a life and death situation.' " 539 N.W.2d at 223. The meeting was arranged without notification to defendant's attorney. *Id.* The defendant was informed of his rights and agreed to answer questions without the presence of his attorney and subsequently revealed details of the murder for which he was charged. *Id.* The same sequence was repeated a week later when the defendant again requested an interview with law enforcement and waived his right to counsel. *Id.* at 223–24.

The defendant in *Ford* argued on appeal that the statements he made to law enforcement should have been excluded from evidence under our *Lefthand* ruling. *Id.* at 224. We clarified that "*Lefthand* did not create an automatic exclusionary rule for a violation of Rule 4.2, MRPC, by a prosecutor." *Id.* The measure instead was whether "the fair administration of justice had been compromised." *Id.* We looked to "the egregiousness of the government's action in total" and held that the case then before us did not warrant exclusion of the evidence. *Id.* at 224–25. *Lefthand* and *Ford* however dealt only with the application of MRPC 4.2 to custodial communications occurring after a defendant was charged. In *Lefthand* the statement was suppressed in the interest of justice, while in *Ford* it was not. *Lefthand,* 488 N.W.2d at 801–02; *Ford,* 539 N.W.2d at 225.

Whether MRPC 4.2 applies to statements taken in a voluntary, noncustodial interview is a matter of first impression for this court. The trial court ordered the suppression of the portion of appellant's statement made after Dixon asked that the interview be terminated based on *O'Keefe,* 132 F.3d 1252. In *O'Keefe* the court ruled that government lawyers were not "authorized by law" to interview corporate employees known to be represented by corporate counsel concerning a matter under investigation. *Id.* at 1257. The ruling in *O'Keefe* however was based upon a violation of the separation of powers principle by the U.S. Attorney General's internal "housekeeping" rules which permitted such interviews, and was not based upon the ethical no-contact rule.[9] *Id.* at 1254–55, 1257.

Both parties find fault with the court of appeals' opinion holding that MRPC 4.2 was violated and reversing the trial court's

---

8. An intervening court of appeals case held that MRPC 4.2 was not violated when the prosecutor used an agent to communicate with a party known to be represented by counsel because the party was not in custody, basing its ruling on *United States v. Dobbs,* 711 F.2d 84 (8th Cir.1983). *State v. Roers,*

520 N.W.2d 752, 759 (Minn.App.1994), *rev. denied* (Minn. Oct. 14, 1994).

9. The rule at issue in *O'Keefe* was Missouri Supreme Court Rule 4–4.2 and is identical to our own MRPC 4.2. *O'Keefe,* 132 F.3d at 1253.

order partially suppressing appellant's statement based upon its determination that suppression was "warranted only when the prosecutor's conduct is so egregious that it compromises the fair administration of justice." *Miller,* 586 N.W.2d at 138. Appellant argues that *Lefthand* expressly provided the trial court with the authority to exclude evidence for violations of MRPC 4.2, and the court of appeals erred in not deferring to the trial court's discretion to determine both a violation and the proper relief. Appellant further argues that the behavior of the state was egregious – that the Dakota County Attorney's Office arranged the execution of the search warrant in order to gain access to appellant without informing his counsel and used law enforcement both to interview appellant and block Dixon's access to his client.

The state, on the other hand, asserts that the court of appeals erred when it ignored the "authorized by law" exception and that the exception covers the actions of prosecutors advising law enforcement agents on the conduct of interviews of represented persons prior to the commencement of judicial proceedings. The state cites two Eighth Circuit Court of Appeals cases in support of its proposition that criminal investigators and prosecutors are authorized by law to contact uncharged suspects even though represented by counsel. In *United States v. Dobbs,* 711 F.2d 84 (8th Cir.1983), a suspect who had not been charged confessed to an FBI agent who knew that the suspect had retained counsel. *Id.* at 85. The court held that in some circumstances the conduct of a prosecutor might implicate the no-contact rule, but that a confession obtained by the prosecution in a "noncustodial interview * * * prior to the initiation of judicial proceedings against the appellant did not constitute an ethical breach" of the no-contact rule. *Id.* at 86. The court held that the rule "does not require government investigatory agencies to refrain from any contact with a criminal suspect because he or she previously had retained counsel."

*Id.* In a similar opinion filed by the same court the following month, the court held that the no-contact rule was "not * * * intended to stymie under-cover investigations when the subject retains counsel" and there was no ethical violation by the prosecutors when a suspect made an incriminating statement to an informant after the government knew that the suspect was represented by counsel in the matter under investigation. *United States v. Fitterer,* 710 F.2d 1328, 1333 (8th Cir.1983).

The state also points to *United States v. Hammad,* 858 F.2d 834 (2d Cir.1988), a federal case in which the no-contact rule was held to apply to prosecutors and to provide protection to the attorney-client relationship beyond the right to counsel established by the Fifth and Sixth Amendments. In *Hammad,* the federal government suspected the defendant of Medicaid fraud and arranged for an informant to contact the defendant regarding a fictitious subpoena allegedly served on the informant to appear before the grand jury investigating the fraud. *Id.* at 835–36. The prosecuting assistant U.S. attorney even provided a phony subpoena for the informant to show the defendant. *Id.* at 836. The trial court granted the defendant's motion to suppress the incriminatory statements made by the defendant to the informant because it was taken in violation of the no-contact rule when the government knew at the time of the statements that the defendant was represented by counsel in the matter under investigation. *Id.* at 836–37. The court of appeals reversed the exclusion of evidence but rejected the government's arguments that the no-contact rule did not apply:

> We decline to hold, as the government suggests, either that [the no-contact rule] is limited in application to civil disputes or that it is coextensive with the sixth amendment. Nor has the government provided an adequate basis for reversing the able district judge's determination, after the suppression hearing, that the prosecutor knew [the defen-

dant] had legal representation or that [the informant] was his "alter ego." We are mindful, however, that suppression of evidence is an extreme remedy that may impede legitimate investigatory activities. Accordingly, we find, in this case, that suppression of the recordings and videotapes constituted an abuse of the district court's discretion.

*Id.* at 837. The court went on to carefully analyze the application of the no-contact rule to criminal investigations, noting that the disciplinary rules were designed to protect the legal profession rather than the individual defendant's constitutional rights to counsel. *Id.* at 838–39. The court interpreted the no-contact rule's "authorized by law" exception to cover "legitimate investigative techniques" used by prosecutors but found the use of the phony subpoena violated the rule. *Id.* at 839–40. Exclusion of the evidence however was seen as an excessive remedy, particularly since the law was "unsettled" in this area. *Id.* at 842. The court specifically rejected a bright-line rule and left the determination of rule violations and appropriate sanctions to a case-by-case analysis. *Id.* at 840.

■ We agree with the court in *Hammad* that because the interests protected by MRPC 4.2 and the constitutional protections relating to an individual's right to counsel are fundamentally different, there is no rational basis to conclude that the application of the protection afforded should necessarily be coextensive. Thus we do not perceive that the application of MRPC 4.2 should be limited, in a criminal context, to contacts with an attorney's client after the client has been charged. Adverse counsel's contacts with an attorney's client can be disruptive and deleterious to the attorney's relationship with a client irrespective of whether the client has been charged with a crime, and the need for an attorney's counsel in an adverse interview is certainly no less before the client is charged than after. We hold that the appropriate analysis is to look at

alleged violations on a case-by-case basis, examining the totality of the circumstances of the contact to determine if it went beyond appropriate and commonly accepted investigatory activity of police to implicate issues relating to the fair administration of justice on the part of the prosecuting attorney. This is the balance struck in *Hammad* and is consistent with our holdings in *Lefthand* and *Ford,* where we looked not just to the violation of the Rule but to the government's conduct as a whole to determine if it was sufficiently egregious to warrant suppression of the evidence.

■ We interpret the "authorized by law" exception to MRPC 4.2 to mean that legitimate investigative processes may go forward without violating MRPC 4.2 even when the target of the investigation is represented by counsel, but when the process goes beyond fair and legitimate investigation and is so egregious that it impairs the fair administration of justice, it is not "authorized by law." Our concern then, is whether the conduct of the Dakota County Attorney's Office here was a fair and legitimate investigation and thus authorized by law, or whether it was so egregious as to implicate issues relating to the fair administration of justice justifying suppression of appellant's statement.

■ It is clear from the record that the Dakota County Attorney's Office was aware that appellant was the general manager of BSL during the civil investigation and the comments to MRPC 4.2 establish that this relationship falls within the protection of the Rule. Assistant County Attorney Stassen knew by December 4, 1994 at the latest that appellant as a BSL employee was represented by counsel because the meeting Stassen attended on that date included both BSL's corporate counsel and appellant as a BSL managerial employee. At this point Stassen was clearly prohibited from interviewing appellant as part of the ongoing investigation, which was then a civil investigation, without notification to Dixon. Stassen's knowledge may be im-

puted to Skelly, who was involved tangentially with the civil investigation in the fall of 1994 and was subsequently put in charge of the criminal investigation in January of 1995. Both Stassen and Skelly attended the meeting on May 9, 1995 when law enforcement officers were briefed about the execution of the search warrant and appellant was identified as an interview target.

Thus the question is whether there is a rational basis to conclude that a change in the nature of the investigation from civil to criminal justifies allowing the prosecutor's contact with appellant as "authorized by law," when contact was clearly prohibited by MRPC 4.2 when the proceeding was civil in nature. We believe there is none. While we are not unmindful of the severity of the sanction of suppression of evidence developed in a police investigation, in circumstances where, as here, not only has the proscription of MRPC 4.2 prohibiting contact with a represented client been violated, the record reflects a systematic isolation of the client from his attorney by refusing to terminate the non-custodial interview despite the attorney's request and prohibiting the attorney from speaking with the client.

Under these circumstances, the Dakota County Attorney's Office at least ratified if not directed Detective Forbord's conduct in isolating Attorney Dixon from appellant, and MRPC 4.2 was violated because the prosecutor's conduct was sufficiently egregious to implicate concerns relating to the fair administration of justice. Therefore the "authorized by law" exception to MRPC 4.2 does not apply.

### III. Appropriate Sanction for Breach of MRPC 4.2

▮ We next turn to the question of the proper sanction for violation of Rule 4.2 under the circumstances here. We accord broad discretion to trial courts in imposing sanctions for violation of discovery rules or attorney misconduct and absent a clear abuse of discretion, the trial court determination will not be overturned.

*State v. Lindsey,* 284 N.W.2d 368, 373 (Minn.1979). Principles guiding this determination include encouraging compliance with the rules and assuring that a party violating the rules does not profit from the misconduct. *See, e.g., McCarthy Well Co., Inc. v. St. Peter Creamery, Inc.,* 410 N.W.2d 312, 317 (Minn.1987). These principles apply also to the trial court's determination of the appropriate sanction for violation by an attorney of an ethical rule relating to a matter before the court, but with the added concern for protecting the public and guarding the administration of justice. *In re Weems,* 540 N.W.2d 305, 308 (Minn.1995). Sanctions should seek to mitigate the prejudice inflicted upon the party impacted by the rule violations.

▮ While we are not unmindful of the harshness of the trial court sanction that "[t]he proper remedy for this violation is to exclude the portion of the statements [sic] made after [Dixon] requested that the officers not interview [appellant]," we believe it appropriately reflects the seriousness of the ethical violation and the prejudice to appellant. The history of Dixon's representation of BSL and its employees, including appellant, was well known to the Dakota County Attorney's Office, including Skelly, who was involved in the carefully planned execution of the search warrant. The shift of a civil into a criminal investigation under the circumstances here simply cannot justify stripping attorney Dixon of his right to be present under Rule 4.2 when the prosecution contacted his client.

We reverse the court of appeals and reinstate the trial court's order suppressing the portion of appellant's statement taken after Dixon asked that the interview be terminated.

Reversed and remanded.