STATE of Minnesota, Respondent,

v.

Justin Lamont BUCKINGHAM,
Appellant.

No. A08–1331.

Supreme Court of Minnesota.

Sept. 10, 2009.

**66**

G. Tony Atwal, Assistant State Public Defender, St. Paul, MN, for appellant.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, MN, for respondent.

OPINION

ANDERSON, G. BARRY, Justice.

Appellant, Justin Lamont Buckingham, was found guilty of one count of aiding and abetting first-degree premeditated murder, one count of aiding and abetting first-degree drive-by shooting murder, two counts of aiding and abetting attempted first-degree premeditated murder, and five counts of aiding and abetting attempted first-degree drive-by shooting murder. He was sentenced to life imprisonment without the possibility of parole, two 180–month consecutive sentences, and three 243–month concurrent sentences. These convictions and sentences arose out of the shooting death of Ricardo Walker on February 11, 2007. Buckingham appeals his conviction and argues: that his statements to the police should have been suppressed because they were taken in violation of *State v. Scales*, 518 N.W.2d 587, 592 (Minn. 1994), and were taken without the consent of Buckingham's attorney; that the evidence was insufficient to convict him of first-degree murder; that he was given a sentence that was over the statutory maximum; and that the prosecutor committed misconduct. We affirm as modified.

On the evening of February 10, 2007, Ricardo Walker was at Gabby's Bar in northeast Minneapolis with his cousins, Ronnie Walker, Ronnie Williams, Sutorise Wright, and Sherrod Greene along with a friend, Teshome Smith. According to Wright, Justin Buckingham and Larry Hatcher were also at the bar. Wright had known Buckingham for 18 years and Hatcher for 20 years. Wright testified that Ricardo Walker also knew both Buckingham and Hatcher.

An altercation developed around 2:00 a.m. on February 11 as Ricardo Walker, Williams, and Wright left Gabby's. Wright testified that approximately ten in-

dividuals, including Buckingham, Hatcher, and Michael Jackson, began shouting at Ricardo Walker and Wright. Wright testified he saw Jackson's hand inside his pocket holding what Wright believed to be a gun. Wright testified that Buckingham and Hatcher shouted: "Cash Money, f* * * you, Cash Money gonna get you." Wright stated that Buckingham and Hatcher referred to themselves, with others, as Cash Money.

Ricardo Walker, Williams, and Wright left the scene of the argument in a minivan; Walker was driving, Wright was in the front passenger seat, and Williams was sitting behind Walker. Ronnie Walker, Greene, and Smith followed the minivan in a Buick, with Ronnie Walker driving, Greene in the front passenger seat, and Smith sitting behind Greene. Ricardo Walker stopped the minivan near the intersection of Broadway and Washington Avenues to allow the Buick to catch up.

Ronnie Williams, sitting behind Ricardo Walker, heard a gunshot and saw a white sport utility vehicle (SUV) with someone pointing a gun out the front passenger window. The SUV was parallel to the minivan. The front passenger window of the SUV was open, but Williams could not see the shooter. A second gunshot was fired through the driver's window of the minivan striking Ricardo Walker in the head. After the second gunshot, Williams ducked and heard three or four more gunshots, and then left the scene to call 911. Williams returned to the shooting scene and saw that Ricardo Walker had a head wound, but was able to talk; Walker told Williams that "Man–Man" shot him.[1]

Ronnie Walker, the driver of the trailing Buick, intended to stop the Buick next to the minivan and talk to Ricardo Walker, when he heard gunshots and saw a white SUV with someone firing a chrome gun from the front passenger window of the SUV. Ronnie Walker could not see the shooter. He testified that as shots were fired at the Buick, he ducked and then put the Buick in reverse and backed away. After the SUV drove away, Ronnie Walker ran to the slowly moving minivan, opened the driver's door, and put it in park. He saw that Ricardo Walker had been shot in the head and called 911.

Greene, who was in the Buick, testified that he saw gunshots fired from the passenger side of the SUV but did not know if the gunshots came from the front or rear passenger-side windows.

Wright, who ·was in the front passenger seat of the minivan driven by Ricardo Walker, initially refused to cooperate with police.[2] He told an officer on the scene that he knew who shot Ricardo Walker but that he would not tell police. He later told police he had no idea who shot Ricardo Walker. A few days after the shooting, after he talked with his aunt, Wright told the police, and testified at trial, that he saw Buckingham, Hatcher, and Jackson get into the SUV after the altercation outside the bar. Wright testified that Hatcher was the driver, Buckingham was in the front passenger seat, and Jackson was in the rear passenger seat.

Wright testified that as the SUV pulled alongside the minivan and gunshots were fired, he and Ricardo Walker both ducked down and to the right. As they both looked up, a second bullet came through the window and struck Ricardo in the head. Wright ducked again, heard more shots, and got out of the minivan. Wright

---

1. Hatcher was known as "Man–Man."

2. In August 2005 Wright lied to police about his name during an unrelated investigative stop.

testified that he saw Buckingham fire the shots.

Officer Susan York arrived on the scene and questioned Ricardo Walker. Officer York asked who shot him and, when Walker paused, told Walker that "I don't believe that you are going to make it. I'm here to listen to you if you want to tell me what happened, if you would like to take this opportunity." Walker told her that "Man–Man" shot him. When asked, Walker explained that "Man–Man" was a 22–year–old black male, who lived near Lowry Avenue North and whose real name was Larry. Walker also said that "Dee" was in the SUV, in the front passenger seat. At this point, a medical team arrived and Officer York was not able to ask Walker any further questions. Walker died shortly thereafter.

Later that morning, police found a white 2007 Chevrolet Suburban parked outside Hatcher's residence.[3] Police found Hatcher's fingerprints on the exterior of the driver's door and Buckingham's fingerprints on the dashboard area near the front passenger seat.

Hatcher was arrested on February 14, 2007. The same day, Buckingham voluntarily appeared for an interview with Sergeant Bruce Folkens and Sergeant Chris Karakostas, who arrested Buckingham. Folkens testified that, during the February 14 interview, following administration of a *Miranda* warning, Buckingham admitted that he was at Gabby's on February 10.

On March 6, after contacting the police from jail on several occasions wanting to talk to them, the police interviewed Buckingham again. The police recorded the *Miranda* warning and Buckingham's request to not record the interview. Folk-

ens testified as to what Buckingham told him in that interview.

Buckingham said that on February 10, Hatcher, driving the SUV, picked up Buckingham. Next, Hatcher picked up Jackson and Deron Hazley ("Dee"), and they went to Gabby's to meet "J." Jackson and Hazley brought a handgun into the Suburban, and neither went inside Gabby's.

Buckingham and Hatcher went inside and met Wright and Ricardo Walker. At 2:00 a.m., Buckingham left Gabby's and saw Hazley standing on the sidewalk with the handgun. During an argument among Wright, Hatcher, and Jackson, Jackson took the handgun from Hazley. Following the argument, Hatcher, Buckingham, Jackson, and Hazley left in the Suburban. Hatcher drove the Suburban, with Buckingham in the front passenger seat, and Jackson and Hazley sitting behind Buckingham and Hatcher, respectively.

Jackson spotted Wright's minivan and directed Hatcher to "get on the van." Hatcher did so and shots were fired from the Suburban. Buckingham denied being the shooter. Hatcher then drove to Interstate 94 and the group attended two parties before Hatcher dropped everyone off at their homes. The next morning Hatcher called Buckingham and told him that the Suburban was gone. The Suburban passengers met later that morning and decided to make up a story about the events of the preceding evening and early morning. Buckingham claimed he went along with the story because he was not involved in the shooting. Buckingham was indicted on one count of aiding and abetting first-degree premeditated murder; one count of aiding and abetting first-degree drive-by shooting murder; five

---

3. Subsequent investigation revealed that the Suburban was a rental vehicle and the individual who rented the Suburban had loaned it to Hatcher.

counts of aiding and abetting attempted first-degree premeditated murder; and five counts of aiding and abetting attempted first-degree drive-by shooting murder. The case proceeded to trial.

At trial, Buckingham did not testify and the defense rested without calling any witnesses. The following aiding and abetting offenses were submitted to the jury: first-degree premeditated murder of Ricardo Walker (count 1); first-degree drive-by shooting murder of Ricardo Walker (count 2); attempted first-degree premeditated murder of Wright (count 3); attempted first-degree drive-by shooting murder of Wright (count 4); attempted first-degree premeditated murder of Williams (count 5); attempted first-degree drive-by shooting murder of Williams (count 6); attempted first-degree premeditated murder of Ronnie Walker (count 7); attempted first-degree drive-by shooting murder of Ronnie Walker (count 8); attempted first-degree premeditated murder of Greene (count 9); attempted first-degree drive-by shooting murder of Greene (count 10); attempted first-degree premeditated murder of Smith (count 11); and attempted first-degree drive-by shooting murder of Smith (count 12).

The jury found Buckingham guilty of counts 1 through 6, 8, 10, and 12, but not guilty of counts 7, 9, and 11. The district court sentenced Buckingham to life imprisonment without the possibility of parole on the first-degree premeditated murder conviction (count 1), two consecutive 180–month terms on the attempted first-degree premeditated murder convictions (counts 3 and 5), and three concurrent 243–month terms on the attempted first-degree drive-by shooting murder convictions (counts 8, 10, and 12). Buckingham raises several issues on direct appeal.

## I.

Buckingham claims that his statements to police should have been suppressed because the statements were taken in violation of *State v. Scales*, 518 N.W.2d 587 (Minn.1994). The State argues that there was no substantial violation of the *Scales* recording requirement, and, therefore, the statements should not be suppressed.

In *Scales*, we held that police must record any custodial interrogations when questioning occurs at a place of detention. 518 N.W.2d at 592. If a violation of *Scales* is "substantial," any statements obtained from the interrogation must be suppressed. *Id.* Whether a violation is substantial must be determined on a case-by-case basis. *Id.* We review de novo whether an officer's failure to record a custodial interrogation is a substantial violation of *Scales*. *State v. Inman*, 692 N.W.2d 76, 79 (Minn.2005). Findings of fact by the district court, however, are subject to a clearly erroneous standard. *Id.* at 79–80 (citing *State v. Thaggard*, 527 N.W.2d 804, 807 (Minn.1995)).

We need not determine if there was a *Scales* violation here because, if there was, it was not substantial. In *Inman*, even though a *Miranda* warning was not recorded, we determined that there was no substantial violation because the defendant requested the interview not be recorded and did not raise any factual disputes during the omnibus hearing regarding the substance of the unrecorded statement. 692 N.W.2d at 81.

Here, the police recorded the *Miranda* warning and Buckingham's request to not record the interview. Furthermore, as in *Inman*, Buckingham's failure to raise any factual disputes regarding the substance of the unrecorded statement at the omnibus hearing is fatal to his claimed

*Scales* violation.[4] The violation, if any, was not substantial.

Buckingham next argues for suppression of his statements because the statements were the result of improper contact with police and without his lawyer. Buckingham had contacted Sergeant Folkens several times, seeking to talk to him about the case. Buckingham had also requested the presence of his attorney. Sergeant Folkens was unable to contact Buckingham's attorney, and he so advised Buckingham. Buckingham eventually expressed his willingness to speak without his attorney present and requested that the interview not be recorded.

 When reviewing a district court's ruling on a pretrial motion to suppress evidence, we "review the district court's factual findings under a clearly erroneous standard and the district court's legal determinations de novo." *State v. Gauster,* 752 N.W.2d 496, 502 (Minn.2008) (quoting *State v. Jordan,* 742 N.W.2d 149, 152 (Minn.2007)) (internal quotation marks omitted). Police may speak with a defendant, even after appointment of counsel, so long as the defendant does not clearly assert a desire to deal with the police only through counsel. *State v. Mattson,* 357 N.W.2d 344, 345 (Minn.1984) (citing *Edwards v. Arizona,* 451 U.S. 477, 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *State v. Howard,* 324 N.W.2d 216, 221 (Minn.1982)). Minnesota Rule of Professional Conduct 4.2 imposes a stricter standard on attorneys and, once a defendant is represented by an attorney, a prosecutor cannot interview the defendant without opposing counsel's presence or consent. *State v. Clark,* 738 N.W.2d 316, 337 (Minn. 2007). Police contact may be attributed to a prosecutor where the prosecutor orders or ratifies the contact. *Id.* at 337–38.

Buckingham acknowledges that, because Sergeant Folkens did not notify the prosecution about his interview with Buckingham, the conduct of Folkens was arguably not improper under *Clark.* But Buckingham argues that we should not "excuse or condone" what occurred and further argues that we should impose an affirmative duty on law enforcement officers, in addition to prosecutors,

> to either (1) obtain explicit consent of counsel before interrogating the defendant; (2) notify the prosecutor that the defendant wants to talk, but is requesting his counsel be present; or (3) refrain from communicating with the defendant until the prosecutor and counsel have discussed the request and directed the most appropriate [course] of action.

 We have never imposed such a duty on law enforcement, but even were we to do so, it does not necessarily follow that statements must be suppressed where that duty is breached. Instead, where prosecutor violations of Rule 4.2 occur, we take "a case-by-case approach to determining whether the state's conduct is so egregious as to compromise the fair administration of justice." *Clark,* 738 N.W.2d at 340–41 (citing *State v. Ford,* 539 N.W.2d 214, 224–25 (Minn.1995)). Assuming without deciding that law enforcement owes a duty similar to prosecutors, the behavior here was not egregious. First, under current case law, Sergeant Folkens did not violate any rules. *See id.* at 342 (considering that under case law in effect at the time of the alleged violation, the prosecutor could have believed he had complied

---

4. For the first time on appeal, Buckingham argued that he did not understand that the *Miranda* warning applied to his unrecorded statements. But we stated in *Inman* that "the relevant time to create a factual dispute is at the omnibus hearing where the *Scales* issue was raised and decided." 692 N.W.2d at 81.

with Rule 4.2). Second, Sergeant Folkens attempted to contact Buckingham's attorney two times[5] and advised Buckingham of his *Miranda* rights when he interviewed him again on March 6. Overall, the actions of Sergeant Folkens do not support any claim of inappropriate behavior let alone bad faith or egregious conduct. Accordingly, we conclude that no improper contact occurred and Buckingham's assertion of error is without merit.

## II.

■ Buckingham also argues that the evidence was insufficient to prove that he aided and abetted first-degree premeditated murder and attempted first-degree murder. Appellate review of a sufficiency claim is "limited to ascertaining whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged." *State v. Merrill,* 274 N.W.2d 99, 111 (Minn.1978). In doing so, the appellate court must review the evidence in the light most favorable to the State and presume that the jury believed the State's witnesses and disbelieved any contrary evidence. *State v. Steinbuch,* 514 N.W.2d 793, 799 (Minn.1994). Furthermore, determining the credibility or reliability of a witness lies with the jury alone. *Merrill,* 274 N.W.2d at 111 (citing *State v. Thompson,* 273 Minn. 1, 36, 139 N.W.2d 490, 515 (1966)). The jury's verdict will be upheld if, "giving due regard to the presumption of innocence and to the state's burden of proof beyond a reasonable doubt, [the jury] could reasonably have found the defendant guilty." *State v. Pier-*

*son,* 530 N.W.2d 784, 787 (Minn.1995). A jury verdict may be based on the testimony of a single eyewitness. *State v. Burch,* 284 Minn. 300, 313, 170 N.W.2d 543, 552 (1969).

■ A person is guilty of aiding and abetting a crime if he played a knowing role in the crime and took no steps to thwart its completion. *State v. Ostrem,* 535 N.W.2d 916, 924 (Minn.1995). But mere presence does not prove that a person aided or abetted. *Id.*

■ The only testimony that identified Buckingham as the shooter came from Wright. Before he died, Ricardo Walker identified "Man–Man" (Hatcher) as the shooter. Buckingham essentially argues that these two statements contradict each other and, because Walker was dying, his statement is more credible. Buckingham further argues that Wright's identification is not credible because Wright refused to cooperate with the police for three days following the murder and had lied to the police on a prior unrelated occasion. Buckingham also argues that because the shooting was stressful and Wright was ducking bullets and then running away, his testimony is also suspect.

■ But while Buckingham stresses all of the factors that may have caused Wright to make a mistake in identification he fails to consider the possibility that *Walker* made a mistake or simply did not see everyone. While a dying declaration is an exception to the hearsay rule, Minn. R. Evid. 804(b)(2), nothing in the rule or case law indicates that such a statement must be considered infallible.[6] Indeed, a

---

5. Sergeant Folkens attempted to reach Buckingham's attorney after Buckingham tried to contact Folkens on February 21; he tried again on March 1 or 2, after Buckingham again contacted him. Buckingham's attorney's voicemail was full both times.

6. Buckingham argues that the fact that *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), excludes dying declarations from the confrontation requirement demonstrates the reliability of dying declarations. But while the fact that some-

reasonable jury could conclude that a witness who was shot in the head is not as reliable as someone who escaped fatal injury.[7] Further, that Hatcher was involved in the shooting does not mean that Buckingham was not. Thus, a reasonable jury could choose to believe Wright's testimony despite Walker's dying declaration.[8] Therefore, we conclude that the evidence is sufficient for a reasonable jury to find Buckingham guilty of aiding and abetting first-degree murder.

### III.

Buckingham argues that the statutory maximum for aiding and abetting attempted first-degree drive-by shooting murder is 240 months imprisonment. Buckingham, however, was sentenced to 243 months, concurrently, for each of these offenses.

■■■■ The State concedes that the maximum sentence was incorrectly calculated. See Minn.Stat. § 609.17, subd. 4(1) (2008) (stating that the maximum penalty for an attempted crime, where the completed crime's maximum penalty is life in prison, is 20 years or 240 months); Minn. Stat. § 609.185(a)(3) (2008) (stating that the maximum penalty for first-degree drive-by shooting murder is life in prison). We have modified a defendant's sentence, rather than remand for resentencing, in cases where departures from the presumptive sentence were not warranted. E.g., State v. Leja, 684 N.W.2d 442, 450 (Minn.

2004) (reducing a sentence of 210 months to the presumptive sentence of 150 months); State v. Spain, 590 N.W.2d 85, 90 (Minn.1999) (reducing a sentence of 144 months to a double durational departure sentence of 96 months). Given the de minimis sentencing error here, we reduce the sentences for aiding and abetting attempted first-degree drive-by shooting murder to 240 months each, the maximum sentence permitted under the statute.

### IV.

Buckingham argues in his pro se brief that the State committed prosecutorial misconduct and thus deprived him of a fair trial. No objection was made to the statements at issue at the time of trial. We review unobjected-to prosecutorial misconduct under a modified plain-error standard of review. State v. Ramey, 721 N.W.2d 294, 302 (Minn.2006). Under this approach, Buckingham must demonstrate (1) error (2) that is plain. Id. If Buckingham demonstrates plain error, then the burden shifts to the State to show that Buckingham's substantial rights were not affected, meaning that the State must show there is no reasonable likelihood that the absence of the prosecutorial misconduct would have significantly affected the verdict of the jury. Id. If there is plain error that affects Buckingham's substantial rights, we must then assess "whether the error should be addressed to ensure fairness and

---

one is dying might make an individual less likely to *lie*, it does not make that individual any less likely to be *mistaken*. Indeed, depending on the injury, a dying person might be *more* likely to be mistaken.

7. Not only does Walker identify someone other than Buckingham as the shooter, we note that Walker's dying statement is inconsistent with Buckingham's statements to the police. Walker's statement placed "Dee" in the front passenger seat, while Buckingham admitted

to police that he (Buckingham) was in the front passenger seat.

8. The jury did not have to believe Wright's testimony to convict Buckingham of aiding and abetting first-degree murder. The jury also could have inferred from the evidence presented that, even if Buckingham was not the shooter, he played a knowing role in the crime and took no steps to thwart its completion. *Ostrem*, 535 N.W.2d at 924.

the integrity of the judicial proceedings." *Id.*

Buckingham argues that the prosecutor inappropriately attributed the following to Buckingham: " 'We're going to get you. My group of guys, my group of guys, my gang, is going to get you. You're messing with the wrong people.' " Buckingham argues that the prosecutor made these statements in order to inflame the jury and he suffered prejudice as a result.

Buckingham was not charged with a crime to benefit a gang and, therefore, gang evidence was not admitted to the trial. But, in order to explain the context of the statement "Cash Money, f* * * you, Cash Money gonna get you," the district court allowed some testimony that witnesses believed Cash Money to be a gang. The district court also included a jury instruction that stated that Buckingham was not on trial for being a member of a gang or associating with persons who may be gang members. The prosecutor's statement was made when he was discussing premeditation and arguing that the shooting was not a rash impulse, but rather a follow-up to previously made threats.

In *State v. Ferguson*, we held that where gang evidence is relevant as to motive, it may be admitted. 581 N.W.2d 824, 834–35 (Minn.1998). In *Ferguson*, substantial gang evidence, including photographs and testimony, was admitted, *id.* at 827–28, while here there were only a few testimonial references to Cash Money as a gang. Furthermore, as in *Ferguson*, the district court gave a jury instruction that Buckingham was not on trial for gang member status or associating with gang members. *Id.* at 835. Therefore, while the testimony and statements that Cash Money was a gang might have been prejudicial to Buckingham, admitting such testimony (or not sua sponte correcting the prosecutor during closing arguments) was

not error, let alone plain error. Finally, even if it was an error for the prosecutor to make those statements, it was not likely to have affected Buckingham's substantial rights, given the eyewitness account and physical evidence against Buckingham. Buckingham's pro se argument lacks merit.

Affirmed as modified.