**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A13-1948**

State of Minnesota,
Respondent,

vs.

Michael Darron Ware,
Appellant.

**Filed December 8, 2014**
**Affirmed**
**Hooten, Judge**

Dakota County District Court
File No. 19HA-CR-13-575

Lori Swanson, Attorney General, St. Paul, Minnesota; and

James C. Backstrom, Dakota County Attorney, Elizabeth M. Swank, Assistant County Attorney, Hastings, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Suzanne M. Senecal-Hill, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Hooten, Presiding Judge; Connolly, Judge; and Johnson, Judge.

**S Y L L A B U S**

In the absence of egregious state conduct or a violation of Minnesota Rule of Professional Conduct 4.2, police, consistent with the Sixth Amendment, may interview a represented defendant outside the presence of counsel so long as the defendant, after being given his *Miranda* rights, provides a knowing, intelligent, and voluntary waiver of his rights, including the right to have counsel present during the interview.

# OPINION

**HOOTEN**, Judge

A Dakota County jury found appellant Michael Darron Ware guilty of two counts of felony domestic assault based on an altercation with his girlfriend. On appeal, Ware argues that the district court committed reversible error by (1) failing to suppress his post-arraignment custodial statement to police and (2) admitting evidence of his prior acts of domestic abuse against a former girlfriend. We affirm.

## FACTS

Ware and his girlfriend, K.T., lived together from October 2012 until February 2013. On the morning of February 14, 2013, K.T. and Ware got into an argument while alone in their apartment. The argument became physical, and Ware "grabbed [her] hair and just started moving [her] head around like a rag doll." Ware also squeezed her face, spit in her face, threw a chair at her, and kicked her. He then left, and K.T. went to her mother's apartment, which was in the same complex. K.T. did not call the police at that time. Later that afternoon, K.T. returned to her apartment, and she and Ware continued arguing. Ware again grabbed her hair, tried to force her head into a sink full of water, and pushed her face into the floor. Ware eventually left, and K.T. called the police to report the assaults.

On February 15, the case was assigned to Investigator Justin Parranto of the Inver Grove Heights Police Department. On February 19, the investigator requested that the county attorney's office file charges in a formal complaint. Subsequent to the incident, Ware called the police department about ten times and left several messages on the

investigator's voicemail, stating that he wanted to discuss the case. On February 20, Ware telephoned the investigator. During the conversation, Ware was "[v]ery manic sounding, very excited, wouldn't stop talking, [and] was adamant that he . . . needed to [meet with the investigator] as soon as possible." On February 21, Ware went to the police station to meet with the investigator, but he was out that day. While at the police station, Ware was arrested for the assault at the investigator's direction.

On February 22, the state filed a complaint in Dakota County District Court, charging Ware with felony domestic assault in violation of Minn. Stat. § 609.2242, subds. 1(2), 4 (2012); terroristic threats in violation of Minn. Stat. § 609.713, subd. 1 (2012); and domestic assault by strangulation in violation of Minn. Stat. § 609.2247, subd. 2 (2012). The same day, Ware's first-appearance hearing was held, and the district court appointed him a public defender. The state later added a second count of felony domestic assault.

On February 25, the investigator spoke with K.T. on the telephone and took her statement. During the telephone call, the investigator told K.T. that he thought Ware's next court date was in March, but he was referring to Ware's supervised-release-violation hearing on an unrelated case.

On February 27, the investigator went to the jail where Ware was being held to interview him. The investigator testified that he did not know Ware had already been arraigned and appointed counsel for the assault case. He believed Ware was still being held in jail on a supervised-release-revocation warrant, which was triggered by the new felony domestic assault and terroristic threats charges. The investigator did not speak to

3

the prosecutor assigned to this case or to anyone at the county attorney's office before interviewing Ware. When he arrived at the jail, Ware was "very adamant and excited to get his side of the story out," and the investigator had to ask Ware to wait to talk until he had administered the *Miranda* warning. The investigator gave a full *Miranda* warning, and Ware stated he wanted to talk. Ware did not indicate that he had an attorney or wanted his attorney to be present.

During the interview, Ware made a number of statements that were later used at trial. Ware stated that K.T. "ruined his life" when she crashed his vehicle shortly before the assault. He was upset with her because "she completely ruined his mother's insurance," and "she made him lose his job." "He said that he was so mad at her that he couldn't even look at her." Ware admitted that he and K.T. were in their apartment on the morning of February 14. After looking at K.T.'s telephone that day, Ware noticed "that she had been texting two male coworkers." During the interview, Ware called K.T. "a slut" and "stupid."

Toward the end of the interview, while Ware and the investigator were discussing an unrelated case involving a car accident, Ware mentioned an "attorney" twice. The investigator later testified that he believed these references to an attorney had to do with the car-accident case. At the end of the interview, Ware offered to provide character witnesses, and the investigator responded, "[T]hat would be between you and your defense attorney." The investigator testified that he was referring to a future defense attorney Ware could retain for the assault case.

4

Ware moved to suppress his statement to the investigator, arguing that the investigator improperly interviewed him without first contacting defense counsel, and that the investigator should have known Ware was represented. At the suppression hearing, the district court found that the prosecutor in this case had no involvement whatsoever in the interview: "There's nothing that even hints or smells of the prosecution being involved to any extent . . . in this interrogation . . . ." The district court found it was "questionable whether [the investigator] knew [Ware] was represented." The district court thus distinguished this case from other cases where the officer knew the defendant was represented, or where the prosecutor gave police permission to interview a represented defendant. The district court noted that Ware initially reached out to the investigator to tell his side of the story, had prior experience with the criminal justice system, and validly waived his right to counsel. The district court concluded that the state's conduct was not egregious and denied Ware's motion to suppress.

At the jury trial, the investigator testified as to Ware's February 27 statement. Also, over Ware's objection, the district court admitted evidence of Ware's prior acts of domestic abuse against a former girlfriend, K.C. The district court found that the probative value of K.C.'s testimony was not substantially outweighed by the danger of unfair prejudice because relationship evidence "sheds light on how the [d]efendant interacts with those close to him." Before K.C. testified, the district court gave the jury a limiting instruction on how it could use this evidence.

K.C. testified that she and Ware have two children in common. She testified that, in August 2004, she and Ware got into an argument while she was driving him to work.

5

He "was upset with [her] and bashed [her] head against the window a few times," causing bruising on the side of her face. K.C. also testified that, in March 2009, Ware was upset with her because she was on the telephone when he arrived at her house. Ware "tried to wrestle [the telephone] away" from K.C. and in the process "pinned [her] on the couch."

The jury found Ware guilty of the two counts of felony domestic assault and not guilty of the other charges. In July 2013, the district court sentenced Ware to 30 months on one conviction and 36 months on the other conviction, to be served concurrently. This appeal followed.

## ISSUES

I.     Did the district court err by denying Ware's motion to suppress his post-arraignment custodial statement to police?

II.    Did the district court abuse its discretion by admitting evidence of Ware's prior acts of domestic abuse against a former girlfriend?

## ANALYSIS

### I.

Ware argues that the district court erred by failing to suppress the post-arraignment custodial statement he made to the investigator because the investigator failed to notify defense counsel or obtain defense counsel's consent to the interview. "When reviewing a district court's pretrial order on a motion to suppress evidence, 'we review the district court's factual findings under a clearly erroneous standard and the district court's legal determinations de novo.'" *State v. Ortega*, 770 N.W.2d 145, 149 (Minn. 2009) (quoting *State v. Jordan*, 742 N.W.2d 149, 152 (Minn. 2007)). Ware contends that the interview was improper and his statement should have been suppressed

because the state violated his Sixth Amendment right to counsel and rule 4.2 of the Minnesota Rules of Professional Conduct. While Ware does not clearly differentiate between these two grounds for suppression, we analyze them separately because "a Sixth Amendment claim is analytically distinct from a [r]ule 4.2 claim and . . . each is governed by a different body of law." *See State v. Clark*, 738 N.W.2d 316, 336 (Minn. 2007).

**A.**

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "This right attaches as soon as the accused . . . is subject to adverse judicial proceedings, including arraignments." *Clark,* 738 N.W.2d at 337. "[T]he Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings," including custodial police interviews. *Montejo v. Louisiana*, 556 U.S. 778, 786, 129 S. Ct. 2079, 2085 (2009) (citations omitted). A defendant may waive his Sixth Amendment right to counsel as long as the waiver is knowing, intelligent, and voluntary. *Id.* (citing *Patterson v. Illinois*, 487 U.S. 285, 292 n.4, 108 S. Ct. 2389, 2394 n.4 (1988)). "The defendant may waive the right *whether or not he is already represented by counsel*; the decision to waive need not itself be counseled." *Id.* (emphasis added). The state bears the burden of proving that a defendant's waiver is valid, and "[i]n deciding whether the government has met its burden, courts consider the circumstances of each case, including the age, experience, and background of the defendant." *Clark*, 738 N.W.2d at 337.

In *Montejo*, the United States Supreme Court concluded that for purposes of "determining whether a Sixth Amendment waiver was knowing and voluntary, there is no reason categorically to distinguish an unrepresented defendant from a represented one." 556 U.S. at 797–98, 129 S. Ct. at 2091–92. The Court found that a defendant in contact with police after arraignment is already protected from police "badgering" by "three layers of prophylaxis" provided in other Supreme Court precedent: (1) the right to have a lawyer present and to be advised of that right, *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S. Ct. 1602, 1628 (1966); (2) the requirement that interrogation must cease once the defendant invokes his or her right to counsel, *Edwards v. Arizona*, 451 U.S. 477, 484, 101 S. Ct. 1880, 1884–85 (1981); and (3) the requirement that no subsequent interrogation can take place until counsel is present, regardless of whether the defendant has consulted with his or her lawyer, *Minnick v. Mississippi*, 498 U.S. 146, 153, 111 S. Ct. 486, 491 (1990). *Montejo*, 556 U.S. at 794, 129 S. Ct. at 2089–90. Essentially, a knowing, intelligent, and voluntary waiver of *Miranda* rights "does the trick" for defendants that wish to speak with police after arraignment and retention of counsel, and "a defendant who does not want to speak to the police without counsel present need only say as much when he is first approached and given the *Miranda* warnings" in order to trigger the protections of *Miranda*, *Edwards*, and *Minnick*. *Id.* at 786, 794, 129 S. Ct. at 2085, 2090.

Our supreme court precedent is consistent with *Montejo*. In *State v. Buckingham*, the Minnesota Supreme Court restated and clarified this state's established legal principles regarding police post-arraignment contact with an accused who is represented by counsel: "Police may speak with a defendant, even after appointment of counsel, so

8

long as the defendant does not clearly assert a desire to deal with the police only through counsel." 772 N.W.2d 64, 70 (Minn. 2009) (citing *State v. Mattson*, 357 N.W.2d 344, 345 (Minn. 1984)).

At the time of the February 27 interview, Ware was represented by counsel. However, he did not "clearly assert a desire to [speak to the investigator] only through counsel." *Id.* The investigator read Ware the full *Miranda* warning, and Ware unambiguously waived his right to have counsel present during the interview. "[W]hen a defendant is read his *Miranda* rights" in a post-arraignment interview "and agrees to waive those rights, that typically" constitutes a valid waiver for Sixth Amendment purposes. *Montejo*, 556 U.S. at 786, 129 S. Ct. at 2085. Both in his brief and at oral argument, Ware did not dispute the validity of his waiver of the right to counsel. Given Ware's valid *Miranda* waiver and his prior experience with the criminal justice system, we conclude that Ware's Sixth Amendment right to counsel was not violated.

**B.**

Minnesota Rule of Professional Conduct 4.2 states: "In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer . . . ." Pursuant to rule 4.2, "a prosecutor cannot interview [a represented] defendant without opposing counsel's presence or consent." *Buckingham*, 772 N.W.2d at 70 (citing *Clark*, 738 N.W.2d at 337). If a prosecutor interviews a represented defendant in violation of rule 4.2, however, suppression of the defendant's statement does not automatically follow. *Id.* "Instead, where prosecutor violations of

9

rule 4.2 occur, we take 'a case-by-case approach to determining whether the state's conduct is so egregious as to compromise the fair administration of justice.'" *Id.* (quoting *Clark*, 738 N.W.2d at 341). It is undisputed in this case that the prosecutor had no contact with Ware without defense counsel's presence or consent, and therefore the prosecutor did not violate rule 4.2.

Police contact with a represented defendant, however, "may be attributed to a prosecutor where the prosecutor orders or ratifies the contact." *Id.* (citing *Clark*, 738 N.W.2d at 337–38); *see* Minn. R. Prof. Conduct 5.3(c)(1) ("[A] lawyer shall be responsible for the conduct of a nonlawyer that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if . . . the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved . . . ."). In *State v. Miller*, the supreme court held that the prosecutor ratified police officers' contact with a represented defendant by instructing police to continue conducting a non-custodial interview and advising them that they should prevent the defense counsel from communicating with the defendant during the interview. 600 N.W.2d 457, 461, 464 (Minn. 1999). Unlike in *Miller*, the investigator here did not speak to anyone at the county attorney's office about Ware's interview before or during the interview. The prosecutor had no knowledge of the interview until it was concluded and thus did not "orde[r] or ratif[y] the [police] contact." *See Buckingham*, 772 N.W.2d at 70. Because the investigator's interview with Ware cannot be attributed to the prosecutor, there was no rule 4.2 violation.

Ware contends that the investigator's interview was improper under *State v. Lefthand*, 488 N.W.2d 799, 801–02 (Minn. 1992). *Lefthand* was the first case to analyze whether evidence should be suppressed as the result of a rule 4.2 violation. *Lefthand* involved highly egregious state conduct, where police interviewed a defendant who was awaiting a rule 20 evaluation, outside the presence of defense counsel and with permission of the prosecutor. *Id.* at 800. The supreme court held that the defendant's statement should have been suppressed, and reversed and remanded for a new trial. *Id.* at 802. The supreme court broadly stated that "in-custody interrogation of a formally accused person who is represented by counsel should not proceed prior to notification of counsel or the presence of counsel. Statements obtained without notice to or the presence of counsel are subject to exclusion at trial." *Id.* at 801–02 (footnote omitted). The *Lefthand* court drew on Minnesota case law that discouraged the practice of post-arraignment custodial police interviews of defendants outside the presence of counsel. *E.g.*, *State v. Renfrew*, 280 Minn. 276, 280, 159 N.W.2d 111, 113 (1968) ("Even where a defendant voluntarily and intelligently waives his constitutional rights, we strongly disapprove of in-custody interrogations if defendant is represented by counsel and counsel has not had an opportunity to be present at the questioning."). The present case is distinguishable from *Lefthand* because, as discussed below, the state's conduct here was not egregious.

Over the next 17 years, the supreme court narrowed the rule it articulated in *Lefthand*. Three years after that case, in *State v. Ford*, the court clarified that "our decision in *Lefthand* did not create an automatic exclusionary rule for a violation of" rule

4.2 by a prosecutor. 539 N.W.2d 214, 224 (Minn. 1995). Rather, suppression of a defendant's statement is appropriate only if the state's conduct is sufficiently egregious. *Id.* at 224–25. In *Ford*, after the defendant was arrested, arraigned, and appointed counsel, he reached out to police to speak about his case, and police subsequently interviewed him without notifying the prosecutor or defense counsel. *Id.* at 223. The supreme court did not find this conduct sufficiently egregious to warrant suppression of the defendant's statements. *Id.* at 224–25. Four years later, in *Miller*, the supreme court found that the state's conduct was egregious enough to warrant suppression. 600 N.W.2d at 468. In that case, police refused to terminate an interview after being asked to do so by defense counsel, and the prosecutor told defense counsel he would not be allowed to join the interview or talk to the defendant. *Id.* at 461, 468.

In two recent cases, the supreme court further clarified *Lefthand*. In *Clark*, the court suggested that the egregiousness of the state's conduct should be analyzed only if there was a rule 4.2 violation. *See* 738 N.W.2d at 338. And, in *Buckingham*, the court declared, "Police may speak with a defendant, *even after appointment of counsel*, so long as the defendant does not clearly assert a desire to deal with the police only through counsel." 772 N.W.2d at 70 (emphasis added). While the court in *Buckingham* cites to *Ford* and *Clark*, it does not cite to *Lefthand*. *Id.*

As analyzed above, there was no rule 4.2 violation in this case. Ostensibly, if there is no rule 4.2 violation, an inquiry into the egregiousness of the state's conduct is unnecessary, and there are no grounds for suppression. *See id.* ("[W]here prosecutor violations of [r]ule 4.2 occur, we take a case-by-case approach to determining whether

12

the state's conduct is so egregious as to compromise the fair administration of justice." (emphasis added)). But, in *Buckingham*, the supreme court "assum[ed] without deciding that law enforcement owes a duty similar to prosecutors" and subsequently analyzed whether the state's conduct was sufficiently egregious to warrant suppression, even though there was no rule 4.2 violation in that case. *See id.* Accordingly, we now inquire into the egregiousness of the state's conduct in this case.

According to Ware, the state's conduct was egregious because too much time had elapsed between when Ware reached out to the investigator and when the interview took place; the investigator should have known Ware was represented by counsel before the interview began; and toward the end of the interview, Ware mentioned an attorney twice, and the investigator referred to Ware's "defense attorney." This set of circumstances is clearly distinguishable from the egregious conduct at issue in *Lefthand* and *Miller*.

In denying Ware's motion to suppress, the district court found that the prosecutor had no involvement in setting up the interview and had no contemporaneous knowledge of the interview. The district court found that Ware had prior experience with the criminal justice system and was very eager to tell his side of the story. The district court further found that Ware validly waived his *Miranda* rights. The district court found that it was "questionable whether [the investigator] knew [Ware] was represented." We defer to the district court's credibility determinations and conclude that the district court's findings are not clearly erroneous. *State v. Miller*, 659 N.W.2d 275, 279 (Minn. App. 2003). The state's conduct in this case was not egregious. It did not evince "improper tactics" or "a pattern of conduct . . . calculated to subvert the intent of our criminal rules."

13

*Lefthand*, 488 N.W.2d at 802 (quotation omitted). This case is more analogous to *Ford*, where the defendant reached out to police after his arrest, and police interviewed him without notifying the prosecutor. 539 N.W.2d at 223.

Ware contends that his case is similar to *Finne v. State*, where this court held that the defendant's post-arraignment custodial statement should have been suppressed under *Lefthand*, *Ford*, and *Miller*. 648 N.W.2d 732, 739 (Minn. App. 2002), *review denied* (Minn. Oct. 29, 2002). But, *Finne* is factually distinguishable from this case. In *Finne*, a law-enforcement officer initially questioned the defendant following her arrest, but the defendant invoked her right to counsel, and the officer immediately ceased questioning. *Id.* at 734. The defendant was appointed a public defender, and six days later the defendant contacted the same officer to speak about the case. *Id.* The officer knew that the defendant had been arraigned. *Id.* at 738. That officer and another officer interviewed the defendant outside the presence of counsel, and at the beginning of the interview, the defendant mentioned her attorney twice. *Id.* at 734, 737–38. The officers did not clarify whether she was represented in the current matter or whether she was referring to representation in another matter. *Id.* at 738. During the interview, the defendant offered information in exchange for leniency. *Id.* at 734. Unlike in *Finne*, Ware did not invoke his right to an attorney during prior questioning, it was questionable whether the investigator knew Ware had been arraigned or was represented, and the investigator did not offer Ware leniency. Also, Ware's brief references to an attorney came at the end of the interview and were apparently made in reference to another case.

14

Under these circumstances, where the state's conduct was not egregious, there was no violation of Ware's Sixth Amendment right to counsel or rule 4.2. Accordingly, the district court did not err by denying Ware's motion to suppress the statement he made to the investigator.

**II.**

Ware next argues that the district court abused its discretion by admitting evidence of his prior acts of domestic abuse against a former girlfriend, K.C., pursuant to Minnesota Statutes section 634.20 (2012). "Evidentiary rulings rest within the discretion of the trial court and will not be reversed absent a clear abuse of discretion." *State v. Bell*, 719 N.W.2d 635, 641 (Minn. 2006).

"Evidence of similar conduct by the accused against the victim of domestic abuse, or against other family or household members, is admissible unless the probative value is substantially outweighed by the danger of unfair prejudice . . . ." Minn. Stat. § 634.20. Such evidence is commonly referred to as "relationship evidence." *State v. Matthews*, 779 N.W.2d 543, 549 (Minn. 2010). "Similar conduct" includes domestic abuse. Minn. Stat. § 634.20. "Domestic abuse" includes "physical harm, bodily injury, or assault" committed against "a family or household member by a family or household member." Minn. Stat. § 518B.01, subd. 2(a)(1) (2012). "Family or household members" include "persons who have a child in common." *Id.* subd. 2(b)(5).

In 2004, the Minnesota Supreme Court expressly adopted section 634.20 "as a rule of evidence for the admission of evidence of similar conduct by the accused against the alleged victim of domestic abuse." *State v. McCoy*, 682 N.W.2d 153, 161 (Minn. 2004).

15

Six years later, this court held that "section 634.20 authorizes the admission of evidence of domestic abuse against [an accused's] family or household members." *State v. Valentine*, 787 N.W.2d 630, 638 (Minn. App. 2010), *review denied* (Minn. Nov. 16, 2010) (admitting evidence of domestic abuse by defendant against his other girlfriend).[1]

Because Ware and K.C. have children in common, K.C. is a "family or household membe[r]" within the meaning of the statute. Minn. Stat. § 518B.01, subd. 2(b)(5). K.C. testified about "similar conduct" under the statute because she testified that Ware physically harmed her on two occasions. *Id.* subd. 2(a)(1); Minn. Stat. § 634.20. Accordingly, the district court properly admitted relationship evidence under section 634.20 unless its "probative value is substantially outweighed by the danger of unfair prejudice." Minn. Stat. § 634.20.

"When balancing the probative value against the potential prejudice, unfair prejudice is not merely damaging evidence, even severely damaging evidence; rather, unfair prejudice is evidence that persuades by illegitimate means, giving one party an unfair advantage." *Bell*, 719 N.W.2d at 641 (quotation omitted). A district court's limiting instruction "lessen[s] the probability of undue weight being given by the jury to

---

[1] Ware argues that the district court erred by admitting K.C.'s testimony because the Minnesota Supreme Court has not adopted section 634.20 as to relationship evidence involving a family or household member, essentially asking this court to overrule its decision in *Valentine*. We decline Ware's invitation and are bound by *Valentine*. *See Doe v. Lutheran High Sch. of Greater Minneapolis*, 702 N.W.2d 322, 330 (Minn. App. 2005), *review denied* (Minn. Oct. 26, 2005) ("[A]ppellate courts are bound by the doctrine of stare decisis, which directs that we adhere to former decisions in order that there might be stability in the law." (quotation omitted)).

16

the evidence." *State v. Lindsey*, 755 N.W.2d 752, 757 (Minn. App. 2008), *review denied* (Minn. Oct. 29, 2008) (quotation omitted).

This court has observed that the probative value of relationship evidence involving a family or household member is high because "evidence showing how a defendant treats his family or household members, such as his former spouses or other girlfriends, sheds light on how the defendant interacts with those close to him, which in turn suggests how the defendant may interact with the victim." *Valentine*, 787 N.W.2d at 637. At the same time, the danger of unfair prejudice in this case is low because the district court gave the jury a cautionary instruction. *Lindsey*, 755 N.W.2d at 757. Accordingly, the probative value of Ware's prior acts of domestic abuse against K.C. is not substantially outweighed by the danger of unfair prejudice.

We conclude that the district court did not abuse its discretion by admitting evidence of Ware's prior acts of domestic abuse against K.C. pursuant to Minnesota Statutes section 634.20.

## D E C I S I O N

The district court did not err by denying Ware's motion to suppress the statement he made to the investigator and did not abuse its discretion by admitting relationship evidence.

**Affirmed.**

17